[No. 730-3.    Division Three.    December 6, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSE TREVINO, *Appellant.*

*John Gavin* (of *Gavin, Robinson, Kendrick, Redman & Mays*), for appellant (appointed counsel for appeal).

*Lincoln E. Shropshire, Prosecuting Attorney*, and *Jon R. Harlan, Deputy*, for respondent.

BARNETT, J.*—The defendant was charged in Yakima County with having committed first-degree murder by

---

*Judge Dolph Barnett is serving as a judge pro tempore of the Court of Appeals pursuant to Laws of 1973, ch. 114.

shooting and mortally wounding one Pedro Alvarez with a .38 caliber revolver. A change of venue was requested, and trial was held in King County. The jury returned a verdict finding the defendant guilty of manslaughter and a special verdict finding defendant was armed with a deadly weapon. The court entered judgment on the verdict.

Because the prosecuting attorney decided to request the death penalty, the defendant, prior to trial, filed a motion for an order in limine prohibiting the prosecutor from either requesting the death penalty or interrogating the jurors on voir dire about their feelings concerning imposition of the death penalty on the ground that such penalty was unconstitutional. That motion and subsequent similar motions were denied. Accordingly, all jurors and prospective jurors were examined with respect to their feelings concerning the imposition of the death penalty, and any who indicated that under no circumstances would they impose that penalty were excluded from the jury. This was done in accordance with the rule announced in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968). After the trial was in progress, it was announced through the media that the United States Supreme Court had determined that the death penalty was unconstitutional and the defendant promptly moved for a mistrial, which motion was denied

The defendant in this case was a 43-year-old farm worker of Mexican descent whose home was in Toppenish, Washington. He and his wife had five sons and a daughter, Olga. The two sons at home and Olga were all in the vicinity of 20 years of age. At the time of the incident here in question, Olga was married to one Jose Capi Velasquez, also referred to in the record as Capi. The record indicates that Olga and Capi had in the past experienced marital problems, including some incidents of assault by Capi upon Olga.

Pedro Alvarez, the deceased, was a close friend of Jose Capi Velasquez. The record indicates that Pedro Alvarez

had previously visited the Trevino home, and on one such occasion, while intoxicated, had started fighting with the defendant's sons. The record also shows that Pedro Alvarez, with permission, made at least one telephone call from defendant's home to Mexico to inform his parents that one of their sons had been killed in a car accident. There was testimony showing that when the defendant tried to collect the charges for the phone bill from Alvarez, a minor altercation ensued. The defendant was eventually paid by Mr. Alvarez for the phone bill.

The incident here in question took place on the evening of April 11, 1972, in Toppenish, Washington. The defendant was home with his wife and two of his sons when Olga arrived there crying, with blood on her face. Without much discussion as to the causes of her injuries, she washed herself and left the house with her mother to visit Olga's sick infant at a hospital. As they departed by automobile, defendant saw a vehicle which he identified as Capi's, following his wife and daughter, honking its horn.

The two Trevino boys, who had also seen the commotion involving the Capi vehicle, then left the house on foot in pursuit of their mother and sister. A short distance from their home, both the Trevino vehicle and the Capi vehicle stopped in the street. Pedro Alvarez, the deceased, emerged from the Capi vehicle. While Capi remained in the car, the testimony shows that Pedro Alvarez proceeded to make threatening and derogatory statements toward the women present and the two Trevino boys who had approached the scene. Furthermore, the testimony shows that Alvarez pulled a knife from his boot, made threatening gestures with the knife, and chased the two Trevino boys toward their home. Upon the urging of Mrs. Trevino, Capi emerged from his car. He pulled Alvarez from the scene, leaving on foot, heading toward the Toppenish business area.

The defendant, after seeing the Capi vehicle following his wife and daughter, procured a .38 caliber pistol from his bedroom and left the house in search of his wife and daughter. He originally traveled to the hospital, expecting

to find them there. Upon failing to find them, he proceeded back towards his home until he met his son, Johnny, who directed him to the scene of the altercation between his wife and daughter and Pedro Alvarez. The defendant and Toppenish police officers arrived after Capi and Alvarez had departed. The defendant's wife related to defendant the incidents that had happened, and defendant stated he was going looking for Capi and Pedro Alvarez.

Two Toppenish police officers sought Capi and Alvarez to determine if either had a knife. The officers located Alvarez in front of Ed's Barbeque in downtown Toppenish. They stopped him, noticed he had been drinking, searched him for weapons, but found none. As the uniformed officers and Alvarez were carrying on a discussion, the defendant drove up in his pickup truck and parked in an angular direction on South Toppenish Avenue, facing Alvarez and the officers. Defendant got out of his pickup and came around to the left front fender so that his upper body was visible. At this time both police officers were within a very few feet of Alvarez. As Alvarez and the defendant began exchanging words in Spanish, one officer returned to the police vehicle and the other officer apparently moved a few feet further away from Alvarez. After defendant asked Alvarez why he wanted to do harm to defendant's family, Alvarez was quoted by defendant as uttering the Spanish equivalent of: "I got to get mother and all." After this statement, Alvarez apparently started to approach the defendant. Defendant testified that he never saw a knife in Alvarez' hand. As Alvarez approached, the defendant raised his revolver and pointed it at Alvarez. Shortly thereafter, a shot went off and Alvarez was killed. The defendant testified he raised the gun when he saw Alvarez move his hands. He also testified he raised the gun so Alvarez would see it and stop. Defendant said he did not intend to shoot or kill Alvarez.

Defendant first assigns error to the exclusion of prospective jurors who would decline to impose the death penalty and to the court's denial of defendant's motion for a

mistrial upon that basis. He contends that these rulings deprived the defendant of jurors who were completely qualified to hear the case. We find no error.

■ The court specifically instructed the jury that the death penalty was no longer an issue in the case and should not be considered in its deliberation, under authority of *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, *rehearing denied,* 409 U.S. 902, 34 L. Ed. 2d 163, 93 S. Ct. 89 (1972). It is presumed, absent any contrary showing, that the jury followed the court's instructions. *State v. Cerny,* 78 Wn.2d 845, 480 P.2d 199 (1971).

■ We believe *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968), is dispositive of the question presented and shows defendant's contention to be without merit. In that case the defendant was convicted of rape and felonious assault. The laws of North Carolina at that time provided that such a conviction should be punishable by death unless the jury provided otherwise. The defendant was convicted, the jury recommended life imprisonment, and a life sentence was imposed. Petitioner argued that his constitutional right to a fair and impartial jury was violated when the prosecution was permitted to challenge for cause any prospective juror who stated he opposed capital punishment or had conscientious scruples against imposing the death penalty. Answering this contention the court in *Bumper v. North Carolina, supra* at 545 said:

> In *Witherspoon* v. *Illinois,* [391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770], we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in *Witherspoon* does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the

Sixth and Fourteenth Amendments to trial by an impartial jury. [Citations omitted.] We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily "prosecution prone," and the materials referred to in his brief are no more substantial than those brought to our attention in *Witherspoon*. Accordingly, we decline to reverse the judgment of conviction upon this basis.

(Footnotes omitted.)

*State v. Golladay,* 78 Wn.2d 121, 470 P.2d 191 (1970), applies this reasoning from *Bumper v. North Carolina, supra*. The defendant therein contended that the trial court erroneously excluded certain jurors from a capital case because of their views opposing capital punishment. The court found no error since the sentence imposed was life imprisonment and there was no showing that the jury was prosecution prone. In so ruling the court stated in *Golladay* at page 146:

On the same day *Witherspoon* was decided, the Supreme Court also denied *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968), where it was held the exclusion of potential jurors opposing capital punishment was not reversible error because the sentence imposed was life imprisonment and there was no showing that the jury selected was "prosecution prone."

It is our opinion that *Bumper v. North Carolina, supra,* controls the disposition of this assignment of error.

In the instant case the defendant was charged with first-degree murder but was convicted of manslaughter. There was no showing that the defendant did not receive a fair trial and no showing that the jury was "prosecution prone"; hence we hold that the authorities above cited are conclusive and govern this assignment of error.

■ Defendant next assigns error to the failure of the court upon request to appoint an interpreter to translate into English and clarify the impact of the Spanish threat uttered by Pedro Alvarez just prior to the shooting. The appointment of an interpreter is a matter resting in the

discretion of the trial court, to be disturbed only upon a showing of abuse. *State v. Korich,* 130 Wash. 243, 226 P. 1016 (1924). Defendant argues that the court's failure to appoint an interpreter deprived him of an opportunity to present evidence of the nature of the violent threats made against him by the decedent and thus prevented him from adequately presenting to the jury his defense of justifiable homicide. We find no merit to this assignment of error. The following testimony of Mr. Trevino contains his primary statements with reference to the threat of the deceased:

> Q Now, did he then make any response to you in answer to the question you put to him, and did he do anything? You tell these people. A Now, when I asked him why did he want to kill my family then he point me, and that's when he gave me, he gave me those words, that *"I got to,"* in Spanish. I'll try to explain it as best I can in English, you know. Q Before you do it, Jose, did he move towards you when he said this? A Yes. Q All right. Try to explain as best you can in English what he said to you. A When he talking to me, make those, gave me the answer, he first point the hand at me and he was —and he came towards me and he motioned his hands. Q And what did he say to you? A He said he had to. He say, *"I got to get mother and all."* Q Now, that's the best you're able to translate it? A That's about the best that I can — Q As one who speaks Spanish and a Mexican-American, what did this mean to you? A *That means that you have to get the entitle,* [*sic*] *mother and the whole family.* Q Did it carry any fear to you? A Why, sure it does. Q What was he threatening to do to you then? A Well, I didn't know. I didn't know that he was—he start coming towards me.
>
> . . .
>
> Q . . . *Did this in Spanish constitute a threat to you right then?* A *Yes, sir.* Q *And the rest of your family?* A *Yes, sir.*

(Italics ours.)

Dr. Sommers, the interpreter whom the defendant wished appointed to interpret this testimony, would have stated in accordance with his offer of proof that the Spanish threat uttered by Alvarez translated literally meant: "I

have to give in the mother to all." In interpreting the phrase, he stated further as follows:

A Well, (Spanish words). First of all, it's: "I have to." There's some sense of the person speaking feeling an obligation. I have to. I'm obliged to. But the key thing that is difficult is the expression, (Spanish words), and there it means to get, in the sense of get at or do violence to. And the metaphor used is to get at the maternal, the matrix. You see, it's choosing as the object of the action that's conceived the maternal, the matrix, the mother, see.

He also offered to testify that the statement was an "extremely serious threat." By comparing the pertinent parts of the offer of proof by Dr. Sommers with the relevant testimony of the defendant, it can be seen that both analyzed Alvarez' threat in basically the same manner.

The trial court heard and observed the defendant on the stand during a very lengthy trial and stated its reason for denying the motion to appoint an interpreter as follows:

The important and relevant portion of what was said was what meaning these words by the decedent conveyed to the defendant just before the shooting. Now, in this case at the trial in Seattle the defendant offered testimony in this regard; in other words, he testified as to what was said in Spanish and what these words meant to him. And they constituted a threat to him, according to his testimony. Now, during the course of the trial Mr. Trevino did not require an interpreter. The Court noted that he was able to express himself very well. He had no difficulty in testifying as to what these words meant to him as stated by the decedent, Pedro Alvarez.

In addition, defendant argues that even though the court properly exercised its discretion in denying the use of an interpreter, it nevertheless committed error in declining to permit Dr. Sommers to testify as an expert witness upon the meaning and force of the threat as it applied to those with an impoverished Mexican-Spanish background such as Pedro Alvarez or Jose Trevino. Defendant contends that he was unable to convey what that threat meant to him with-

out expert testimony and is entitled to a new trial for that reason.

The record in this case convinces us that this contention is not meritorious.

Defendant next urges that the court committed error in withdrawing the defense of excusable homicide from the jury. Excusable homicide is defined in RCW 9.48.150 as follows: "Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, with ordinary caution and without any unlawful intent."

It is clear that before a homicide can be held excusable under this statute four elements must be present. As stated in *State v. Hedges,* 8 Wn.2d 652, 656, 113 P.2d 530 (1941), those elements are as follows:

First, the homicide must have been committed by accident or misfortune; second, it must have occurred in the doing of a lawful act, by lawful means; third, ordinary caution must have been observed by the person responsible for the killing; and fourth, this person must have acted without any unlawful intent. If any one of these four elements be eliminated from the factual situation, the homicide is not within the statutory definition.

In this case it is necessary to consider only one of these four elements, that being the requirement that ordinary caution be observed by the person responsible for the killing. We are of the opinion that the particular facts of this case cannot in any manner be construed to show that defendant acted with "ordinary caution." On that basis the excusable homicide instruction was properly excluded.

The term ordinary caution implies the absence of simple or ordinary negligence. This term was defined in *State v. Williams,* 4 Wn. App. 908, 913, 484 P.2d 1167 (1971), as follows:

Ordinary caution is the kind of caution that a man of reasonable prudence would exercise under the same or similar conditions. If, therefore, the conduct of a defendant, regardless of his ignorance, good intentions and good faith, fails to measure up to the conduct required of a

man of reasonable prudence, he is guilty of ordinary negligence because of his failure to use "ordinary caution." *See State v. Hedges, supra.*

The uncontroverted facts of this case show the following: The defendant voluntarily and intentionally armed himself with a loaded pistol and went searching for Alvarez. He confronted Alvarez at a time when 'Alvarez was in the presence of two uniformed police officers. At the time when the defendant drew his pistol and pointed it at Alvarez, he still had one police officer within a very few feet of him. The defendant also admitted he saw no knife in the hand of Alvarez. Furthermore, at the time the deceased was fatally wounded, he was still approximately 20 feet from the defendant.

This evidence shows that the defendant intentionally and voluntarily pointed a loaded pistol at Alvarez and placed his finger upon the trigger even though he testified he saw no weapon being carried by Alvarez. To act in this manner when Alvarez was in the presence of two police officers who were in fact ready to release him after searching his person, cannot be said to amount to ordinary caution. The firearm is a highly dangerous weapon and extraordinary caution is normally required when handling such a weapon. Even if defendant's assertion that the gun discharged accidentally is believed, it cannot be said that he acted with ordinary caution. The trial court properly refused the instruction on excusable homicide.

▮ Error is also assigned to the failure of the trial court to give instructions proposed by the defendant relative to the defense of justifiable homicide. The justifiable homicide statute, RCW 9.48.170, reads as follows:

Homicide is also justifiable when committed either—
(1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother or sister, or of any other person in his presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and

there is imminent danger of such design being accomplished; . . .

Defendant's learned counsel asserts that the chief error committed by the court in failing to give the proposed instructions was the resultant failure to advise the jury that the defendant not only had the lawful right to defend himself from having a felony committed upon him or having some great personal injury done to his person, but that he also had a right to defend against the commission of a felony or the doing of great personal injury upon the persons of his wife or children. There is no evidence in this case that the wife or children of defendant were present at the time of the shooting. Under the above-quoted statute the defendant would have had the right to defend his wife and/or children, but only if the wife and/or children were present at the altercation. The statute has no application to a situation involving the defense of an absent person. *See* 40 Am. Jur. 2d *Homicide* § 170 (1968).

The case of *State v. Young,* 52 Ore. 227, 96 P. 1067 (1908), supports the above interpretation. During the trial in that case, the defendant admitted assaulting one Van Dran by shooting and wounding him. The theory of the defendant was that he believed Van Dran was about to commit a felony upon the former's wife by committing adultery with her; to prevent the accomplishment of such unlawful purpose and to protect her and their children as well as himself from infamy and disgrace it was necessary to make the assault. Defendant's wife was not present at the time of the assault. The court in *State v. Young, supra* at 232 said:

> By Section 1654, subd. 1, B. & C. Comp., resistance to the commission of crime may be lawfully made by the party about to be injured, or by any other person in his aid or defense when it is necessary to prevent a crime against his person; and Section 1757, subd. 1, B. & C. Comp., justifies the killing of a human being when done by any person to prevent the commission of a felony upon such person or upon his wife. By virtue of these provisions of the statute it is not only the right, but it is the duty, of

the husband to resist an assault about to be made upon his wife, and to use such reasonable force as may be necessary to that end; and, if necessary to prevent the commission of a felony upon his wife, the husband is justified even in taking the life of her assailant. The circumstances, however, must be such that the wife had the right to use the force in her own defense. For the right to defend another is no greater than such other person has to defend himself. *State* v. *Melton,* 102 Mo. 683 (15 S. W. 139). "A person has a right to use violence in defense of another only when the imperiled person would have been justified in using it in his own defense." Wharton, Homicide (3d ed.) 776.

Whatever may have been the state of defendant's mind as to a belief that Van Dran was intending or about to commit adultery with Mrs. Young that night, and whether such belief was well-founded in fact or not, was wholly immaterial, and could in no way aid him in his defense. *Mrs. Young was not present at the time of defendant's assault upon Van Dran, and therefore she could not then have been the subject of an assault to commit a felony by the latter, or in imminent danger of one.*

(Italics ours.) Accordingly, the trial court was correct in refusing to give defendant's proposed instructions on this issue. The instructions on self-defense given by the court were adequate and have been approved by the Supreme Court in *State v. Churchill,* 52 Wash. 210, 100 P. 309 (1909), and *State v. Scheeler,* 45 Wn.2d 661, 277 P.2d 341 (1954).

Judgment is affirmed.

GREEN, C.J., and MUNSON, J., concur.

Petition for rehearing denied January 22, 1974.

Review denied by Supreme Court March 5, 1974.