[No. 24252-1-I.   Division One.   February 3, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. ANDREW G. JANES, *Appellant*.

136

*Lenell Nussbaum* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

AGID, J. — Andrew G. Janes appeals his conviction for the second degree murder of his stepfather, Walter Jaloveckas, and for two counts of second degree assault. He assigns error to the trial court's failure to allow an instruction on self-defense and to various evidentiary rulings excluding expert testimony regarding the battered child syndrome that he contends would have been relevant to establishing that defense. Appellant further challenges the information charging assault as constitutionally defective for failing to allege the element of intent. We agree that he should have been permitted to present evidence of the battered child syndrome and reverse.

On August 30, 1988, the appellant, Andrew Janes (Andy), shot and killed his stepfather, Walter Jaloveckas, as Jaloveckas walked through the front door of their home. Andy then triggered the alarm system in the home to summon the police and fire department. When police arrived,

Andy fired at them, as well as at some empty cars and at the telephone in his house. Mountlake Terrace Police Officer James Blackburn and a bystander, Eve Flores, were slightly injured in the shooting.

Andy was charged by information with one count of murder in the first degree (premeditated), and two counts of assault in the second degree.[1] He was found guilty of the lesser included offense of murder in the second degree and of both assault charges. The trial court found that Andy had suffered a pattern of ongoing abuse at the hands of the decedent and imposed an exceptional sentence of 10 years on the murder conviction.[2] Andy appeals his conviction with respect to all three counts.

An understanding of the nature of the relationship between Andy and his stepfather is important to an understanding of our decision. Jaloveckas moved in with the Janes family in November 1978 when Andy was 7 years old, after Andy's biological father abandoned the family earlier that year. After the family moved into a home of their own in 1980, Jaloveckas became increasingly abusive and subject to unpredictable and sometimes physically violent outbursts of anger. There is extensive testimony in the record with respect to the details of the abuse, which included incidents where Jaloveckas beat or hit Andy, his brother and Gale Janes, their mother, smashed a stereo and bicycles with a sledgehammer, and threatened to torture, kill, or send the boys away for such transgressions as being tardy in completing chores or taking some of his marijuana.[3] While Jaloveckas' actions were reported to Child Protective

---

[1]Count 2 charged Andy with assault on the police officers on whom he fired; count 3 charged him with assault on Eve Flores.

[2]The standard range was 13 to 18 years. The court imposed standard range sentences of 20 months on each assault, to run concurrently with each other and with the 10-year sentence on the murder conviction. The State has not appealed the exceptional sentence.

[3]Jaloveckas sold and used both marijuana and cocaine during the years that he lived with the Janes family.

Services (CPS) on three occasions, CPS did not follow up on those reports. On at least two of the three occasions Ms. Janes or Andy requested that CPS not follow up out of fear of reprisal by Jaloveckas.

On the evening of August 29, an incident occurred that the appellant contends triggered the events of the next day. After a loud argument during which Jaloveckas yelled angrily at Ms. Janes for about 45 minutes, Jaloveckas stopped by Andy's room and spoke to him in a low tone. Ms. Janes testified that when Jaloveckas used a low tone, it usually meant that he was making a threat. She did not hear what he actually said, and Andy could not remember what was said. The next morning Ms. Janes woke Andy after Jaloveckas left for work and told him that he should be sure to get all his work done because Jaloveckas was still angry.

One of Andy's school friends testified that he stopped by Andy's home on the way to school. Andy brought out a shotgun and loaded it, showed it to his friend and told him he was going to kill Jaloveckas. Andy left the shotgun under some clothes in his room, went to school and left after two classes. After returning home, Andy broke a padlock off the door to the bedroom shared by Ms. Janes and Jaloveckas in which Jaloveckas kept his supply of alcohol and marijuana. Andy drank whiskey, smoked marijuana, and retrieved a shotgun and loaded 9 mm. handgun that belonged to Jaloveckas. When Jaloveckas returned at 4:30 p.m., Andy shot him as he entered the home. Jaloveckas died from two gunshot wounds to the head.

There is no dispute that Andy killed his stepfather. Instead, defense counsel sought to base Andy's defense on a theory of justifiable homicide. The defense argued that Andy acted in self-defense because he perceived himself to be in imminent danger of serious bodily harm as a consequence of a condition analogous to "battered woman syndrome", stemming from the 10 years of abuse he had suffered at the

hands of his stepfather.[4] The trial court ruled, however, that in the absence of evidence showing that Andy was in fact in imminent danger at the time of the shooting, there was an insufficient factual basis to support giving an instruction regarding self-defense.

Although the court did not permit testimony supporting the defense of justifiable homicide, it did permit the defense experts, Dr. Christopher Varley and Dr. Bruce Olson, to testify on the defense of diminished capacity. Both testified that Andy suffered from posttraumatic stress disorder, primarily as a result of abuse at the hands of Jaloveckas, and that as a result of this disorder, Andy's capacity for premeditation was "impaired". The court instructed the jury that it could consider a mental illness or disorder where the existence of a particular mental state was a necessary element of a particular crime.

## I
### BATTERED CHILD SYNDROME

A defendant is entitled to have his theory of the case submitted to the jury under appropriate instructions when the theory is supported by sufficient evidence in the record. *State v. Griffith*, 91 Wn.2d 572, 574, 589 P.2d 799 (1979). The issue of self-defense is properly raised if the defendant produces "any evidence" tending to show self-defense. *State v. Adams*, 31 Wn. App. 393, 396, 641 P.2d 1207 (1982) ("[O]nly where no plausible evidence appears in the record upon which a claim of self-defense might be based is an instruction on [self-defense] not necessary.") *See also State v. Walker*, 40 Wn. App. 658, 661-62, 700 P.2d 1168 (to be entitled to an instruction on self-defense, the defendant bears the initial burden of producing some credible evidence tend-

---

[4]While the appellant's theory of justifiable homicide was based on both self-defense and defense of his mother, the claim of defense of others does not apply to these facts. Homicide in defense of another is justified only if that person is present at the time. RCW 9A.16.050(1); *State v. Trevino*, 10 Wn. App. 89, 99-100, 516 P.2d 779 (1973), *review denied*, 83 Wn.2d 1009 (1974). Andy's mother was not present at the time of the shooting.

ing to show the defendant acted in self-defense) (citing *State v. Acosta*, 101 Wn.2d 612, 621, 683 P.2d 1069 (1984), *review denied*, 104 Wn.2d 1012 (1985)). The question of whether there is sufficient evidence to raise a claim of self-defense is a question of law for the trial court, which must apply a subjective standard, viewing the evidence from the perspective of the defendant at the time of the act. *State v. McCullum*, 98 Wn.2d 484, 488-89, 656 P.2d 1064 (1983); *State v. Adams*, 31 Wn. App. 393, 396, 641 P.2d 1207 (1982). Here, the trial court held, following an offer of proof, that evidence of the battered child syndrome could not, as a matter of law, support a finding of self-defense because, it concluded, there was no "imminent threat" to Andy at the time of the shooting. It therefore excluded the testimony and refused the proffered instruction. For the reasons stated below, we hold that it was error to exclude testimony concerning the battered child syndrome and to refuse to submit the issue of the reasonableness of Andy's perceptions, in light of expert testimony on the battered child syndrome, to the jury.[5]

█ Self-defense requires a showing of (1) reasonable apprehension of a design to commit a felony or to do some great personal injury, and (2) imminent danger of that design being accomplished. RCW 9A.16.050(1); *State v. Negrin*, 37 Wn. App. 516, 521, 681 P.2d 1287, *review denied*, 102 Wn.2d 1002 (1984). While the "imminent danger" prong requires the jury to find that the victim honestly and reasonably believed that the aggressor intended to inflict serious bodily injury in the near future, *Negrin*, 37 Wn. App. at 521, there need be no evidence of an actual physical assault to demonstrate the immediacy of the danger. *Walker*, 40 Wn. App. at 662. Fear alone does not entitle a defendant to a self-defense instruction. *State v. Kidd*, 57 Wn. App. 95, 786 P.2d 847 (criminal culpability is not lessened when one acts in self-defense due to an honest but *unreasonable* belief in the need for force), *review denied*, 115 Wn.2d 1010 (1990); *State v. Bell*, 60 Wn. App. 561, 566-67,

---

[5]The latter holding assumes, of course, that the testimony is sufficient to support giving the instruction.

805 P.2d 815 (a good faith belief that deadly force is necessary is not in itself sufficient to support a self-defense instruction), *review denied*, 116 Wn.2d 1030 (1991). Some evidence of aggressive or threatening behavior, gestures, or communication by the victim is typically required to show that the defendant's belief that he or she was in imminent danger of great bodily harm was reasonable. *Walker*, 40 Wn. App. at 663.

■ As noted above, Washington uses a subjective standard to evaluate the imminence of the danger a defendant faced at the time of the act. This requires the court and the jury to evaluate the reasonableness of the defendant's perception of the imminence of that danger in light of all the facts and circumstances known to the defendant at the time he acted, including the facts and circumstances as he perceived them before the crime. *State v. Wanrow*, 88 Wn.2d 221, 235-36, 559 P.2d 548 (1977). Because battering itself can alter the defendant's perceptions, Washington courts have held that expert testimony with respect to the battered woman syndrome is admissible to explain a woman's perception that she had no alternative but to act in the manner that she did.[6] As the *Walker* court explained:

> The function of evidence of the battered woman syndrome, offered through expert testimony, is merely to assist the trier of fact in evaluating the reasonableness of both the use of force and the degree of force used in a case involving the recognized circumstances of self-defense. That the defendant is a victim of a battering relationship is not alone sufficient evidence to submit the issue of self-defense to a jury. It is the *perceived imminence* of danger, based on the appearance of some threatening behavior or communication, which supplies the justification to use deadly force under a claim of self-defense.

(Italics ours.) 40 Wn. App. at 664-65.

---

[6]The scientific basis and relevancy of testimony regarding battered woman syndrome is now well established. *State v. Hanson*, 58 Wn. App. 504, 508, 793 P.2d 1001 (citing *State v. Allery*, 101 Wn.2d 591, 597, 682 P.2d 312 (1984) (testimony concerning battered woman syndrome admissible to explain defendant's perception of the threat and the reasonableness of the force employed in self-defense against the threat)), *review denied*, 115 Wn.2d 1033 (1990).

■ ■ In analyzing the question of whether the jury should have been permitted to hear expert testimony concerning the battered child syndrome in the context of the defendant's claim of self-defense here, we consider: (1) whether scientific understanding of the battered child syndrome is sufficiently developed so as to be generally admissible, and (2) whether the expert testimony offered would have been helpful to the trier of fact in the context of this case.[7] *See* ER 702; *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984).

While no Washington case has yet recognized the "battered child syndrome" in this context,[8] the pertinent literature indicates that there is a sufficient scientific basis to justify extending the battered woman syndrome to analogous situations affecting children. *See, e.g.*, Comment, *Killing Daddy: Developing a Self-Defense Strategy for the Abused Child*, 137 U. Pa. L. Rev. 1281 (1989); Van Sambeek, *Parricide as Self-Defense*, 7 Law & Inequality 87 (1988-1989); P. Mones,[9] *When a Child Kills: Abused Children Who Kill Their Parents* (1991).

Neither law nor logic suggests any reason to limit to women recognition of the impact a battering relationship may have on the victim's actions or perceptions. We have noted in other contexts that children are both objectively and subjectively more vulnerable to the effects of violence than are adults. *State v. Fisher*, 108 Wn.2d 419, 424, 739 P.2d 683 (1987) (children are among the most vulnerable members of society); *State v. Grewe*, 117 Wn.2d 211, 221,

---

[7]Whether the witness qualifies as an expert is also an aspect of this analysis, but that is not at issue here.

[8]Washington courts have recognized "battered child syndrome" in the context of admitting evidence to show that the injuries of the child victim of a batterer are not accidental, but are instead the result of physical abuse by a person of mature strength. *E.g.*, *State v. Toennis*, 52 Wn. App. 176, 185, 758 P.2d 539, *review denied*, 111 Wn.2d 1026 (1988); *State v. Mulder*, 29 Wn. App. 513, 515, 629 P.2d 462 (1981).

[9]Paul Mones was one of the experts consulted by appellant's experts in this case.

813 P.2d 1238 (1991) (one aspect of children's extreme vulnerability is their tendency to trust). For that reason, the rationale underlying the admissibility of testimony regarding the battered woman syndrome is at least as compelling, if not more so, when applied to children. Children do not reach the age of majority until they are 18 years of age. RCW 26.28.010, .015. Until then, they have virtually no independent ability to support themselves, thus preventing them from escaping the abusive atmosphere. Further, unlike an adult who may come into a battering relationship with at least some basis on which to make comparisons between current and past experiences, a child has no such equivalent life experience on which to draw to put the battering into perspective. There is therefore every reason to believe that a child's entire world view and sense of self may be conditioned by reaction to that abuse. Van Sambeek, *supra* at 98.

For these reasons, we recognize that the battered child syndrome is the functional and legal equivalent of the battered woman syndrome, and hold that scientific understanding of the battered child syndrome is sufficiently developed to make testimony concerning that syndrome admissible in appropriate cases.

After reviewing the offer of proof and arguments in the record, we also conclude that the information the appellant's experts offered concerning the battered child syndrome and its application in this case would have been helpful to the trier of fact. Without it, the jury could not adequately evaluate the reasonableness of Andy's perception that he was in imminent danger of death or serious bodily harm at the time he killed his stepfather.

The testimony offered by the appellant's experts and a review of the materials cited by the appellant illustrate just how counterintuitive and difficult to understand the dynamics of the relationship between a batterer and his victim can be. For example, it is unlikely that the average juror would be able to understand, without Dr. Olson's testimony on hypervigilance in the battered child, the significance of

Andy's claim that he acted in self-defense.[10] Battered children live in an environment wholly different from the safe and nurturing home depicted by traditional values and social expectations.[11] The impact of long-term abuse on a child's emotional and psychological responses is a matter that is thus beyond the average juror's understanding. Without expert testimony to put the child's perceptions into context, a jury cannot fairly evaluate the reasonableness of the child's perception of the imminence of the danger to which he or she reacted. The jury in this case should, on remand, be permitted to hear the testimony and evaluate the reasonableness of Andy's perceptions and actions in light of the battered child syndrome evidence.

## II
### DIMINISHED CAPACITY

The appellant next contends that the trial court erred by rejecting evidence of the appellant's reputation for peacefulness offered to support his theory of diminished capacity. The State argues that the trial court erred by allowing the diminished capacity instruction at all. We reject both arguments.[12]

■ Character evidence does not prove or disprove an element of a charged crime or a particular defense; rather,

---

[10]Hypervigilance is a heightened ability to discern preaggressive behavior in others, a condition which occurs with long-term abuse. In this context, the defense experts could have explained to the jury that a child may notice a change in the usual pattern of abuse which would be almost imperceptible to one who has not been abused. This, in turn, may suggest to the victim of abuse a level of imminent and acute danger very different from that perceived by one not continuously exposed to an abusive environment. Other psychological effects that may contribute to a child's sense that he or she has no alternatives include learned helplessness, depression, isolation, low self-esteem, fear of reprisal, a belief in the omnipotence of the batterer, and a belief in the futility of either resistance or flight. *See* P. Mones, *When a Child Kills: Abused Children Who Kill Their Parents* (1991).

[11]Van Sambeek, *Parricide as Self-Defense*, 7 Law & Inequality 87 (1988-1989).

[12]The State does not explicitly cross-appeal on these grounds, but seeks simply to have both the judgment and sentence affirmed.

"[i]ts relevance is to permit, but not require, the jury to infer from the particular character trait that it is unlikely or improbable that the defendant committed the charged act." *State v. Thomas*, 110 Wn.2d 859, 865, 757 P.2d 512 (1988). Here, there is no dispute as to whether the defendant committed the act; the only issue is his mental state. Since his reputation is not probative of his mental state, it was properly excluded.

■ The trial court also did not err in allowing an instruction on diminished capacity. A diminished capacity instruction is to be given "whenever there is substantial evidence of such a condition and such evidence logically and reasonably connects the defendant's alleged mental condition with the inability to possess the required level of culpability to commit the crime charged." *State v. Griffin*, 100 Wn.2d 417, 419, 670 P.2d 265 (1983) (citing *State v. Edmon*, 28 Wn. App. 98, 621 P.2d 1310 (listing the foundation criteria necessary to permit an instruction with respect to diminished capacity), *review denied*, 95 Wn.2d 1019 (1981)). Here, there is substantial evidence in the record to support the diminished capacity instruction. Defendant's experts testified that Andy suffered from posttraumatic stress disorder and that Andy's ability to premeditate was "impaired" as a result. The foundation requirements of *Edmon* were met, and the jury was properly instructed on that basis.

### III
#### SUFFICIENCY OF THE INFORMATION

■ Finally, the appellant contends that the information charging assault in the second degree was constitutionally defective for failing explicitly to allege the common law element of intent.[13] An information sufficiently charges a crime

---

[13]The language of each count is as follows:

"SECOND DEGREE ASSAULT, committed as follows: That the defendant, on or about the 30th day of August, 1988, did assault another person, to-wit: . . ., with a deadly weapon, to-wit: a shotgun; proscribed by RCW 9A.36.021(c), a felony."

The language of the statute under which the defendant was charged reads as follows:

if it apprises accused persons of the accusations against them with reasonable certainty. *State v. Leach,* 113 Wn.2d 679, 695, 782 P.2d 552 (1989). As noted by the court in *State v. Kjorsvik,* 117 Wn.2d 93, 109, 812 P.2d 86 (1991):

> [T]he question . . . is whether all the words used would reasonably apprise an accused of the elements of the crime charged. Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied.
>     . . . This inquiry turns on the elements of the particular crime charged and the meaning to be derived from the language of the charging document.[14]

(Footnotes omitted.)

▋ An assault is by definition an intentional act and is commonly understood as such. *State v. Hopper,* 118 Wn.2d 151, 158-59, 822 P.2d 775 (1992); *State v. Dukowitz,* 62 Wn. App. 418, 424, 814 P.2d 234 (1991). Here, we also note that the jury was specifically instructed that intent is a required element of assault. *See Kjorsvik,* 117 Wn.2d at 102 n.13. There was no constitutional violation.

Reversed and remanded.

GROSSE, C.J., and KENNEDY, J., concur.

Review granted at 119 Wn.2d 1002 (1992).

---

"**Assault in the second degree.** (1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:

"    . . . .

"(c) Assaults another with a deadly weapon[.]" RCW 9A.36.021(1)(c).

[14]The *Kjorsvik* court also cited with approval the following observation of a prominent commentator in this field:

> The fundamental purpose of the pleading is to inform the defendant of the charge so that he may prepare his defense, and the test for sufficiency ought to be whether it is fair to defendant to require him to defend on the basis of the charge as stated in the particular indictment or information. *The stated requirement that every ingredient or essential element of the offense should be alleged must be read in the light of the fairness test just suggested.*

*Kjorsvik,* 117 Wn.2d at 109 (quoting 1 C. Wright, *Federal Practice* § 125, at 365-66 (2d ed. 1982)).