[No. 34440-8-II. Division Two. August 21, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. PONCIANO RAMIREZ-DOMINGUEZ, *Appellant*.

234

*Lisa E. Tabbut*, for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *Patricia M. Anderson, Deputy*, for respondent.

¶1 QUINN-BRINTNALL, J. — Ponciano Ramirez-Dominguez appeals his bench trial conviction of the alternative count of first degree child molestation and one count of first degree kidnapping of Jane Doe (date of birth June 21, 1993). He challenges the validity of his jury trial waiver and the adequacy of the certified Spanish interpreter, asserting that he is an illiterate field worker and was "deprived" of an interpreter in his native Mixteco language and had to settle for a Spanish interpreter. Because the record establishes that Ramirez-Dominguez requested Spanish interpretation, he generally conducted his business in Spanish, and his wife and Jane Doe's family communicated with Ramirez-Dominguez in Spanish, we affirm.

## FACTS

¶2 Ramirez-Dominguez[1] and his family were friends of Jane Doe's family. Both families live in Oregon and had on one occasion picnicked together in Woodland, Washington. Periodically, Jane Doe's parents allowed Ramirez-Dominguez to take Jane Doe and her two sisters to pick berries to earn some money.

¶3 In 2003, Ramirez-Dominguez took Jane Doe from her family home without her parents' permission. Jane Doe,

---

[1] Ramirez-Dominguez's date of birth is November 19, 1965.

who was 10 years old, believed that they were going to Ramirez-Dominguez's house and that he was going to pay Jane Doe to help his wife make tamales. Instead of driving to his house, Ramirez-Dominguez took Jane Doe to Woodland. He told Jane Doe that her parents had given him permission to take her there.

¶4 Ramirez-Dominguez first drove Jane Doe to a house[2] and molested her behind the house. Jane Doe then asked Ramirez-Dominguez to take her home. Instead, he drove Jane Doe, against her will, to the location in Woodland where the families had picnicked together.

¶5 While Jane Doe and Ramirez-Dominguez were near the river, Ramirez-Dominguez took his pants down, pulled Jane Doe's pants down, and lay on top of her. Jane Doe later testified that Ramirez-Dominguez put his finger in her vagina. When questioned by police, Ramirez-Dominguez admitted to Detective Manual Hernandez[3] that he tried to put his penis in Jane Doe's vagina but because it hurt her, he stopped. Ramirez-Dominguez then drove to Jane Doe's house where he dropped her off after giving her $20.

¶6 At trial, Ramirez-Dominguez testified that he took Jane Doe to Woodland alone, believing that he had her parents' permission to take her because her father had called him the night before to confirm it. He testified that Jane Doe had undressed herself, but he denied touching her breasts or her genitals. He further testified that he believed Jane Doe wanted to have sex with him and that Jane Doe became upset when he told her to pull up her pants. He also testified that they held hands and hugged.

¶7 Jane Doe's parents did not learn about what happened until January 2005, when Jane Doe's mother found cigarettes in Jane Doe's dresser drawer. Jane Doe's mother asked Olga Gerberg, a family friend and apartment

---

[2] The house was owned by a woman who hired Ramirez-Dominguez to care for her garden.

[3] Detective Hernandez explained the *Miranda* rights in Spanish. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

manager, to help her confront Jane Doe about the cigarettes. Jane Doe told her mother and Gerberg about what Ramirez-Dominguez had done to her in 2003. Gerberg called the police. Subsequently, the State filed an amended information charging Ramirez-Dominguez with one count of first degree rape of a child (count I) and/or, in the alternative, first degree child molestation, and first degree kidnapping (count II).

¶8 Throughout the proceedings, the trial court appointed at least two court-certified[4] Spanish interpreters and one court-qualified[5] Spanish and Mixteco interpreter. All interpreters[6] expressed their concern regarding Ramirez-Dominguez's "broken" Spanish because he was uneducated, and that his grammar and syntax did not "line-up" appropriately. However, none of the interpreters indicated an inability to communicate in Spanish with Ramirez-Dominguez.[7]

¶9 Following the attempts of one of the interpreters to communicate with Ramirez-Dominguez in Mixteco Barro, Ramirez-Dominguez informed the trial court that he preferred to proceed in Spanish, stating, "Forgive me, but from the beginning I have been wanting Spanish. I don't know why [the Spanish/Mixteco interpreter] was called as an interpreter. From the beginning I have not accepted him as

---

[4] A "certified interpreter" is an interpreter who is certified by the Office of the Administrator for the Courts (now known as the Administrative Office of the Courts). Former RCW 2.43.020(4) (1989).

[5] A "qualified interpreter" is a person who is able to readily interpret or translate spoken and written English for non-English-speaking persons and to interpret or translate oral or written statements of non-English-speaking persons into spoken English. RCW 2.43.020(2).

[6] We note that the trial court complied with RCW 2.43.050 and ER 604 requiring the taking of an oath before interpreting the proceedings.

[7] Ramirez-Dominguez was unable to specify to the trial court which Mixteco language he spoke. We note that during oral arguments, his appellate counsel was also unable to specify which Mixteco language Ramirez-Dominguez spoke. We also note that at trial, the parties referred to several Mixteco language dialects, Alto, De La Costa (San Juan), and Barro. The parties made no reference to any other Mixteco dialect.

my interpreter." 1 Report of Proceedings (RP) at 65-66. The trial court ruled it was appropriate to proceed in Spanish.[8]

¶10 Following a bench trial, the trial court found Ramirez-Dominguez guilty of the alternative first degree child molestation and first degree kidnapping. At sentencing, the trial court ruled the two crimes constituted the same criminal conduct and imposed a standard range sentence of 68 months, with 24 to 48 months in community custody. Ramirez-Dominguez appeals.

## ANALYSIS

JURY TRIAL WAIVER

¶11 Ramirez-Dominguez asserts that due to his language difficulty, his recorded oral waiver of the jury trial was not knowing, voluntary, and intelligent. Specifically, he asserts that he did not understand the proceedings interpreted to him in Spanish because his native language is Mixteco. He also argues that his waiver was invalid because he refused to sign the jury waiver form because he was "sad." Br. of Appellant at 7. Ramirez-Dominguez concludes that his waiver was also invalid because the trial court accepted it without making sure he understood the differences between a jury and a bench trial. We disagree.

¶12 Every criminal defendant has a right, under both the state and federal constitutions, to a jury trial. *City of Pasco v. Mace*, 98 Wn.2d 87, 653 P.2d 618 (1982). Waiver of a right to a jury trial is an important constitutional right,[9] and review is de novo. *State v. Treat*, 109 Wn. App. 419, 427, 35 P.3d 1192 (2001); *State v. Vasquez*, 109 Wn. App. 310, 319, 34 P.3d 1255 (2001), *aff'd*, 148 Wn.2d 303, 59 P.3d 648 (2002).

---

[8] Prior to the trial court's ruling, both defense counsel and the deputy court administrator informed the trial court that all efforts to locate an interpreter who spoke Ramirez-Dominguez's unidentified native language had failed.

[9] The Sixth Amendment to the United States Constitution guarantees criminal defendants a right to trial by jury. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI.

 ¶13 "The waiver must either be in writing, or done orally on the record." *Treat*, 109 Wn. App. at 427. Washington courts have held oral waivers[10] on the record are sufficient if made knowingly, intelligently, voluntarily, and free from improper influences.[11] *State v. Stegall*, 124 Wn.2d 719, 724-25, 881 P.2d 979 (1994); *State v. Donahue*, 76 Wn. App. 695, 697, 887 P.2d 485, *review denied*, 126 Wn.2d 1023 (1995). When examining the record, we consider whether the defendant was informed of his constitutional right to a jury trial. *City of Seattle v. Williams*, 101 Wn.2d 445, 451, 680 P.2d 1051 (1984). We also examine the facts and circumstances generally, including the experience and capabilities of the accused. *State v. Downs*, 36 Wn. App. 143, 145, 672 P.2d 416 (1983) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)), *review denied*, 100 Wn.2d 1040 (1984).

¶14 No colloquy is required for a waiver of the right to a jury; all that is required is a personal expression of waiver by the defendant. *Stegall*, 124 Wn.2d at 725, 730. The State has the burden of proving the waiver was valid. *State v. Wicke*, 91 Wn.2d 638, 645, 591 P.2d 452 (1979). When examining an oral waiver of the right to a jury trial, "every reasonable presumption should be indulged against the waiver . . . absent an adequate record to the contrary." *Wicke*, 91 Wn.2d at 645. Defense counsel's representation that defendant knowingly, intelligently, and voluntarily relinquished his jury trial rights is also relevant. *Downs*, 36 Wn. App. at 146.

¶15 In *Wicke*, the defendant stood silently as counsel waived his right to a jury. In addition, the record failed to demonstrate that defense counsel had consulted with Wicke or that the trial court questioned Wicke's concurrence to the

---

[10] The existence of a written waiver is not determinative but is strong evidence of the waiver's validity. *State v. Downs*, 36 Wn. App. 143, 145, 672 P.2d 416 (1983), *review denied*, 100 Wn.2d 1040 (1984).

[11] Washington's constitution generally affords broader protection of the jury trial right than does the federal constitution. *State v. Smith*, 150 Wn.2d 135, 156, 75 P.3d 934 (2003), *cert. denied*, 541 U.S. 909 (2004).

waiver, thus the waiver was not knowing, intelligent, and voluntary. *Wicke*, 91 Wn.2d at 645.

¶16 In contrast to *Wicke*, the trial court here held a detailed colloquy in which Ramirez-Dominguez, both directly and through his attorney, expressed his desire to have the case heard by the trial court. With the help of a Spanish interpreter, Ramirez-Dominguez told the trial court that he wanted his trial to be heard by the court and that he had gone over the waiver and its meaning with his trial attorney. Additionally, defense counsel told the trial court that counsel communicated with his client through "a number of discussions" about the waiver and that his client decided to "try this case in front of a judge." 1 RP at 208. Defense counsel also asked the trial court to accept his client's oral waiver of jury and explained that they had already discussed the written jury waiver form and the interpreter translated it to Ramirez-Dominguez. Counsel further explained to the trial court that Ramirez-Dominguez did

> not want to sign any paperwork at all. That is not because he does not want to waive jury, it is just because he does not want to sign any more paperwork.
>
> He feels that he had been deceived by the police officer in this case when he signed the [*Miranda*] rights form, and that he has decided that he will not be signing any more paperwork.

1 RP at 209.

¶17 Following defense counsel's request, the trial court asked Ramirez-Dominguez whether he understood his right to a trial by jury of 12 people and whether he understood that by waiving, he was also giving up that right. Defense counsel asked the trial court to go through each right on the waiver form "one by one" because Ramirez-Dominguez's response was that he did not understand but wanted to continue and wanted "this to end." 1 RP at 210. Ramirez-Dominguez responded affirmatively to each of the trial court's questions confirming that his attorney had also explained the rights to him. Additionally, Ramirez-

Dominguez responded that he wished to have the case tried by the trial court "[a]s soon as possible." 1 RP at 211. When the trial court repeated the question, Ramirez-Dominguez again confirmed that he wished the case to be tried by the trial court.

¶18 Contrary to Ramirez-Dominguez's assertion on appeal that the record is "replete with [his] inability to effectively communicate in any language," the record concerning the waiver hearing indicates Ramirez-Dominguez was aware of what was happening and was able to participate throughout the proceedings.[12] Br. of Appellant at 17. Ramirez-Dominguez's signature on the waiver form was unnecessary because his oral waiver was sufficient and was made knowingly, intelligently, voluntarily, and free from improper influences. *Donahue*, 76 Wn. App. at 697. As discussed above, the trial court did not simply accept defense counsel's representations about Ramirez-Dominguez's waiver, which would have been relevant to the trial court's inquiry. *Downs*, 36 Wn. App. at 146. The trial court also engaged in a detailed colloquy with Ramirez-Dominguez about his rights to a jury trial. We affirm the finding that the trial court's acceptance of the jury waiver was proper.

---

[12] During the CrR 3.5 hearing, the State presented several witnesses who testified that they had no difficulty communicating with Ramirez-Dominguez in Spanish. For example, Jane Doe's father, who is also a Mixteco native speaker, testified that he communicated with Ramirez-Dominguez only in Spanish, stating that "[t]o me he speaks [Spanish] fine, like me." 2 RP at 293. At trial, Marta Rutherford testified that, despite the grammar issues, Ramirez-Dominguez was able to get his points across during the CrR 3.5 hearing.

In addition, Gresham (Oregon) Police Detective Hernandez testified at the hearing that Ramirez-Dominguez told him that Ramirez-Dominguez had been speaking Spanish since he was three years old and that he could read a little Spanish. Hernandez further testified that he felt that he adequately communicated with Ramirez-Dominguez in Spanish, but that the Spanish Ramirez-Dominguez used was informal, not very good, and was indicative of a low educational level. But their conversation "flowed very well." 1 RP at 197. Hernandez testified that when he first contacted Ramirez-Dominguez, he noted that Ramirez-Dominguez's wife spoke to Ramirez-Dominguez in Spanish.

INTERPRETING AT TRIAL

¶19 Ramirez-Dominguez next asserts that he was denied adequate interpreting at his criminal bench trial and, thus, was denied his right to confront the witnesses against him and was unable to be "constitutionally present" at his own trial. Suppl. Br. of Appellant at 2. Ramirez-Dominguez does not challenge the interpreter's qualifications, but rather he raises the issue of whether he understood the interpreter well enough to be constitutionally present and have a fair trial. Ramirez-Dominguez also claims that he relented to have a Spanish language interpreter only "because it was easier to understand than the proposed Mixteco interpreter." Br. of Appellant at 18.

¶20 "In this state, the right of a defendant in a criminal case to have an interpreter is based upon the Sixth Amendment[13] constitutional right to confront witnesses and 'the right inherent in a fair trial to be present at one's own trial.' " *State v. Gonzales-Morales*, 138 Wn.2d 374, 379, 979 P.2d 826 (1999) (quoting *State v. Woo Won Choi*, 55 Wn. App. 895, 901, 781 P.2d 505 (1989)).

¶21 Washington statutes also provide for interpreters to secure the rights of non-English-speaking persons, who are unable to readily understand or communicate in the English language, and who consequently cannot be fully protected in legal proceedings unless qualified interpreters are available to assist them. RCW 2.43.010.

¶22 When a non-English-speaking person is a party to a legal proceeding, a "certified" interpreter must be appointed unless good cause is shown. Former RCW 2.43-.030(1)(b) (1998); *State v. Tuoc Ba Pham*, 75 Wn. App. 626, 633, 879 P.2d 321 (1994), *review denied*, 126 Wn.2d 1002 (1995). A defendant has a constitutional right to "a competent

---

[13] The Sixth Amendment to the United States Constitution also guarantees criminal defendants "the right . . . to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence." U.S. CONST. amend. VI.

interpreter, [but] not necessarily a certified interpreter." *Pham*, 75 Wn. App. at 633.

■ ■ ¶23 A trial court appoints an interpreter "to assist the person throughout the proceedings," unless the person makes a written waiver. Former RCW 2.43.030(1). But " '[a]s long as the defendant's ability to understand the proceedings and communicate with counsel is unimpaired, the appropriate use of interpreters in the courtroom is a matter within the discretion of the [trial] court.' " *Gonzales-Morales*, 138 Wn.2d at 382 (first alteration in original) (quoting *United States v. Lim*, 794 F.2d 469, 471 (9th Cir.), *cert. denied*, 479 U.S. 937 (1986)). Thus, "the standard for competence should relate to whether the rights of non-English speakers are protected, rather than whether the interpreting is or is not egregiously poor." *State v. Teshome*, 122 Wn. App. 705, 712, 94 P.3d 1004 (2004), *review denied*, 153 Wn.2d 1028 (2005).

¶24 Ramirez-Dominguez cites to federal law to support his argument because "Washington case law does not offer sufficient guidance on determining the competence of an interpreter." *Teshome*, 122 Wn. App. at 712.

¶25 But, as discussed above, a defendant has a constitutional right to a "competent interpreter." *Pham*, 75 Wn. App. at 633. The appointment of an interpreter is within the discretion of the trial court and will not be disturbed on appeal absent a showing of abuse. *State v. Trevino*, 10 Wn. App. 89, 516 P.2d 779 (1973), *review denied*, 83 Wn.2d 1009 (1974).

■ ¶26 In this case, after several court appearances, the trial court determined that it would be proper to proceed in Spanish. Ramirez-Dominguez himself told the trial court that "from the beginning I have been wanting Spanish." 1 RP at 65. Ramirez-Dominguez did not object to the trial court's decision to appoint a certified Spanish interpreter.

¶27 Instead, Ramirez-Dominguez contends that he relented and agreed to a Spanish interpreter only because it

was easier to understand than the Mixteco the court-appointed interpreter spoke. Ramirez-Dominguez relies on *Woo Won Choi*, 55 Wn. App. at 902, to support his claim that he is entitled to a new trial with a Mixteco interpreter he understands.

¶28 However, *Woo Won Choi* does not support Ramirez-Dominguez's claim. In *Woo Won Choi*, the court did not provide an interpreter, nor did it address the defendant directly to determine his need for an interpreter and instead relied on defense counsel's representation[14] that defendant could understand English. 55 Wn. App. at 900. The *Woo Won Choi* court also held that "[i]f the defendant's language skills are adequate enough to understand the trial proceedings and to present his defense, he has no right to an interpreter and there is no issue relating to waiver." 55 Wn. App. at 902.

¶29 At trial, court-certified Spanish interpreter Amira Sonntag noted to the trial court some flaws in Ramirez-Dominguez's grammar during his direct and cross-examination. For example, Ramirez-Dominguez answered that he had "five child" instead of five children. 3 RP at 451. And Ramirez-Dominguez generally did not use possessive pronouns, "s's," in his answers.

¶30 In *Perez-Lastor v. Immigration & Naturalization Service*, 208 F.3d 773 (9th Cir. 2000), the Ninth Circuit found the interpreting was incompetent because Perez-Lastor, who could not read, write, or speak English, had repeatedly stated he could barely understand the interpreter, on numerous occasions did not give responsive answers to questions, and, despite repeated restatement of questions, did not understand several of the inquiries. 208 F.3d at 776, 779, 780-81. Likewise, in *Amadou v. Immigra-*

---

[14] Counsel advised the trial court that he had had "many, many meetings" with his client, that he was confident that his client could understand and answer questions, that his client's brother was present to assist, and that counsel would advise the court if problems occurred. *Woo Won Choi*, 55 Wn. App. at 899. The *Woo Won Choi* court found no error in the trial court's relying on defense counsel's representation in concluding that defendant did not need an interpreter. 55 Wn. App. at 902.

*tion & Naturalization Service*, 226 F.3d 724 (6th Cir. 2000), the interpreter spoke a different dialect than Amadou and the interpreter repeatedly stated that he did not understand Amadou.

¶31 Ramirez-Dominguez cites to a "smattering" of instances where he provided nonresponsive answers on direct examination. Suppl. Br. of Appellant at 5 n.4. A review of those responses does not show that his answers were nonresponsive due to defective interpretation. Rather they show that Ramirez-Dominguez wanted to "tell the truth" in narrative answers. Several times following a "nonresponsive" objection, the trial court asked Ramirez-Dominguez to listen to his attorney's question and give an answer only to that question. Following the trial court's request, Ramirez-Dominguez generally provided a responsive answer.

¶32 Taking all of his answers into context, it appears that Ramirez-Dominguez's answers reflected his lack of familiarity with the judicial proceeding and a reluctance to answer the questions asked without elaborating rather than his inability to understand the interpretation. For example, following the State's objection to his nonresponsive narrative answer, Ramirez-Dominguez stated, "I want to explain—and I don't have a chance." 3 RP at 457.

¶33 Following another State objection, which the trial court sustained, admonishing Ramirez-Dominguez to listen to the attorney's questions, Ramirez-Dominguez responded, "If I don't tell you, they are never going to know, because they—you need to give me space there to be able to tell what happened." 3 RP at 464. The trial court assured Ramirez-Dominguez, stating, "We will be here as long as it takes for you to testify, but you need to respond to your lawyer's questions." 3 RP at 464.

¶34 We agree with the trial court's finding that any "[p]roblems with Spanish conjugation or syntax don't impact the substantive content of that statement or make the substantive content of it any less reliable." 3 RP at 543. In this case, unlike *Perez-Lastor* or *Amadou*, Ramirez-Dominguez did not express any difficulty understanding

the questions he was asked and did not ask for clarification due to interpretation problems. Ramirez-Dominguez communicated with family and friends in Spanish and he also conducted his daily business in Spanish. Ramirez-Dominguez did ask for clarification as to the meaning of a few words such as "employment" and "summer," but when counsel rephrased the question containing those words, Ramirez-Dominguez was able to give an appropriate response to the question. Given Ramirez-Dominguez's illiteracy and the fact that Spanish was his second language, his responses to the questions were in context and appropriate. The Spanish interpreter Ramirez-Dominguez requested adequately protected his rights to a fair trial. Accordingly, we affirm.

Van Deren, A.C.J., and Bridgewater, J., concur.