[No. 11163. Department One. June 13, 1913.]

THE STATE OF WASHINGTON, *Respondent*, v. J. T. TRIBETT, *Appellant*.[1]

HOMICIDE—SELF-DEFENSE—EVIDENCE—ADMISSIBILITY — CORROBORATION. Where defendant, a street car conductor, claimed self-defense in a killing by shooting in the nighttime at an isolated location at the end of the car line, and had testified that the father of the deceased started to get off the car at a certain place, calling to his son, but after consultation between them and threats to "get him" at the end of the line, they rode past their destination and attacked him instead of leaving the car when the end of the line was called, the defendant should be allowed to show that passengers for their destination usually left the car where the father started to get off, as it

[1]Reported in 132 Pac. 875.

tended to corroborate him and show their motive in remaining on the car; also, the reputation of the line for lawlessness, his knowledge thereof, and the isolation of the place, as tending to show whether he acted as a reasonably prudent man in defending himself.

HOMICIDE—DEFENSES—DEFENSE OF SON—INSTRUCTIONS. In a trial for the killing of a father and son, in which the defense claimed that the son was the aggressor, an instruction that the father had a right to come to the defense of his son if, seeing him assaulted, he believed him in danger of great personal injury, should have been qualified by an instruction that, if the son was himself the aggressor, the right to come to his defense remained in abeyance until the son had in good faith attempted to withdraw from the conflict which he had brought on; and failure to make the qualification, where there is no other instruction upon the right of the father to come to the defense of the son, is not cured by other correct instructions on the question of self-defense.

Appeal from a judgment of the superior court for King county, Ronald, J., entered December 7, 1912, upon a trial and conviction of murder. Reversed.

*George H. Rummens* (*Walter S. Fulton* and *Robert L. Blewett*, of counsel), for appellant.

*John F. Murphy* and *H. B. Butler*, for respondent.

GOSE, J.—The appellant was convicted of the crime of murder in the second degree, for shooting and killing one Oliver Sanford, and sentenced to serve a term of from ten years to life in the state penitentiary. At the time of the homicide, the appellant was in the employ of the Puget Sound Traction, Light & Power Company as a street car conductor, in the city of Seattle. He had been so employed for about two years. The killing occurred on the rear platform of the car, a "pay-as-you-enter" car, at the end of the "Ballard Beach line," between 9:30 and 10 o'clock in the nighttime on the 31st day of August, 1912. The appellant had then been a conductor on that line for about four months. This line extends from the business part of the city through and to the limits of what was formerly the city of Ballard. In the course of the outward trip, Otis Sanford, a son of the de-

ceased, charged the appellant with passing people who desired to take the car.    The appellant testified that he answered that he did not see them; that the young man replied that he ought to be reported; that he in turn said, "Here is my number; report me"; that the young man answered, "No, I rather beat your head off"; that he then turned away; that soon thereafter the young man said, "If you ever do me that way I will pull you off this car and beat your head off"; that he said, "All right," and again turned; that the young man then said, "I will go to the end of the line right now with you and pull you off this car and beat your head off"; that he replied, "All right"; that the young man was then leaning against the post at the entrance gate; that when the car reached 32d avenue N. W. and 59th street, the deceased came out of the car and said to his son, "Ain't you going to get off here?" that the son answered, "No, I am going to the end of the line to get this fellow," indicating the appellant; that the appellant then opened the gates and several passengers alighted; that the deceased and his son then stood on the rear platform near the appellant, whispering to each other; that he heard the deceased say to his son, "All right, we will go to the end of the line and get him;" that when the car reached the end of the line, the appellant called, "This is the end of the line"; that he then said to the young man, "End of the line; going off?" that all of the passengers then left the car except the deceased and his son, and that after waiting fifteen or twenty seconds he signaled for the car to proceed; that it then passed onto the Y in order to turn for the return trip to the city; that while upon the Y the deceased and his son advanced simultaneously toward him in a threatening manner, deceased with an uplifted bottle in his hand; that the young man drew back his coat as he came toward him; "I thought he was going for a gun;" that he— the appellant—jumped backward, drew his pistol from the inside coat pocket, fired two shots in rapid succession, first at the young man, and then at the deceased, while they were both

advancing upon him.  The young man fell dead upon the rear platform of the car at the entrance gate, and the deceased stepped off and to the rear of the car, where he sat down or lay down, and shortly expired.

The appellant further testified that passengers were not allowed to ride upon the Y.  The motorman testified that, immediately after the tragedy, the appellant said, "They came out here to beat me up, and when they attacked him he shot them." Other witnesses gave similar testimony.  Another witness, a passenger upon the cars, testified that he heard the young man say to the appellant, "We will get even with you." Roy Sanford, a son of Oliver and a brother of Otis, a witness for the state, testified that he had an engagement for a launch ride with his father, mother, brother and the rest of the family "just as soon as I could get there"; that his launch was at "Carlson's boathouse," near where the canal locks were being constructed; that he was working at a store at Queen Anne and Mercer streets in the city; that he left the store about 9:30 on the evening of the tragedy, and went direct to Ballard to meet his engagement, and that he heard of the tragedy when he had arrived at the boathouse. He further testified that there were two ways of going to the boathouse, one from 32d avenue N. W. and 59th street, the other from the end of the line, and that his father and brother were more familiar with that vicinity than he was.  There was other testimony tending to show that the shortest route to the boathouse was from 32d avenue and 59th street.  The appellant then sought to prove, by a motorman who had worked one year on the Ballard Beach line, the place where people usually left the car to go to the canal locks.  Upon the objection of the state's attorney, this line of evidence was rejected, and the appellant's counsel was warned by the court to pursue the inquiry no further as the evidence was not competent.  The exclusion of this evidence is assigned as error. This witness was then asked to state if he knew the general reputation of the Ballard Beach line as to whether it was a

peaceable line or otherwise.  An objection of state's counsel that the question was "incompetent, irrelevant and immaterial" was sustained.  The appellant's counsel thereupon announced: "I will now make an offer on that question" in the absence of the jury, to which the court said: "The record shows your offer as plainly as it can."  Error is also assigned to the exclusion of this evidence.

These assignments may best be considered together.  The appellant admitted the killing and sought to exonerate himself from criminal culpability by pleading self-defense.  The state's evidence shows that both father and son had an engagement with a son and brother for a launch ride the evening of the tragedy.  The appellant testified that, when the car was approaching 32d avenue and 59th street, the father, whom he had not before observed, passed out of the body of the car to the rear platform, as if to alight at that point, and that he said to the son, "Ain't you going to get off here?" to which the son answered, "No, I am going to the end of the line to get this fellow," indicating the appellant, and that after a conversation between the two, carried on in a whisper, he heard the father make a like remark.  As corroborative of this testimony the appellant was entitled to show, if he could, that 32d avenue and 59th street was the place where passengers going to the boathouse or the canal locks usually left the car.  If the destination of the father and son was the boathouse, as the state's testimony tended to prove, and 32d avenue and 59th street was the usual and customary place for persons to alight going to that point, the testimony rejected was competent and material, in that it tended both to corroborate the appellant and to shed light upon the motive of the deceased and his son in remaining upon the car.  *Robertson v. O'Neill*, 67 Wash. 121, 120 Pac. 884.

So it was with the offer to prove the reputation of the line upon which the tragedy occurred.  If it had a reputation for lawlessness and the appellant knew it, facts which he had

5—74 WASH.

a right to show, it is reasonable to presume that the threats and conduct of the father and the son would have given him greater apprehension than if its reputation had been good. The appellant had a right to act as a reasonably prudent man similarly situated would have acted. In short, he had a right to act upon all he knew—the threats of the parties, their failure to leave the car at a point where their conduct indicated they had intended to leave, the reputation of the line for lawlessness, his knowledge of that fact if he had such knowledge, the hour of the night, the darkness, the isolation at the end of the line, the failure of the parties to leave the car at the end of the line, and the circumstance that they remained upon the car while it passed on the Y in order to reverse and return to the city. All of these facts and circumstances should have been placed before the jury, to the end that they could put themselves in the place of the appellant, get the point of view which he had at the time of the tragedy, and view the conduct of the father and the son with all its pertinent sidelights as the appellant was warranted in viewing it. In no other way could the jury safely say what a reasonably prudent man similarly situated would have done. As the learned trial court correctly instructed the jury:

"Actual or positive danger is not indispensable to justify self-defense. Men when threatened with danger are obliged to judge from appearances and to determine therefrom in the light of all the circumstances the actual state of the surroundings, and in such cases if they act upon reasonable and honest convictions, induced by reasonable evidence under all the circumstances, they will not be held responsible criminally for a mistake as to the extent of the actual danger."

See, also, *State v. Claire*, 41 La. Ann. 191, 6 South. 129.

The court instructed:

"The same condition which will authorize a man to act in defense of himself will authorize him to act in defense of his son. If the father, seeing his son assaulted or menaced with great danger to life, under circumstances such as are cal-

culated to create in the mind of the father a well-grounded belief that the son is in danger of some great personal injury, then such father, if he actually and in good faith believes the life of such son to be in danger, has a right to use such force as may at the time under all the circumstances reasonably seem necessary to prevent the threatened danger to his son."

This instruction should have been qualified by an instruction that, if the son was himself the aggressor, then the right of the father to act in his defense remained in abeyance until the son had in good faith attempted to withdraw from the conflict which he had brought on. This qualification springs from the principle that one who is himself the aggressor may not invoke the law of self-defense until he has in good faith attempted to withdraw from the combat, and one who goes to the defense of another stands in the shoes of him he seeks to defend. 21 Cyc. 827; *People v. Travis*, 56 Cal. 251; *Smurr v. State*, 105 Ind. 125, 4 N. E. 445. The instruction was wrong, and being the only instruction upon the right of the father to go to the defense of the son, we do not think it was rendered harmless by other correct instructions upon the question of self-defense.

The appellant suggests that the verdict is contrary to the evidence. One of the state's witnesses testified that the young man said to appellant, "I will get on some other night and drag you off and beat you up"; that the appellant answered in substance, "If you want to beat me up, come to the end of the car line," and the young man replied, "All right, you are on; I will be out there." This, with the admitted killing and other circumstances not necessary to set forth, made a case for the jury.

The judgment is reversed.

Crow, C. J., Mount, Fullerton, and Parker, JJ., concur.