[No. 59022-2.    En Banc.    April 8, 1993.]

THE STATE OF WASHINGTON, *Petitioner*, v. ANDREW G.
JANES, *Respondent*.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for petitioner.

*Lenell Nussbaum,* for respondent.

*Charles H. Williams* and *Paul Mones* on behalf of Washington Coalition Against Domestic Violence, Washington Association of Criminal Defense Lawyers, and National Battered Women's Law Project, amici curiae for respondent.

DURHAM, J. — In this case, we are asked to address two important and distinct questions. First, is expert testimony regarding the "battered child syndrome" generally admissible in appropriate cases to aid in the proof of self-defense? We answer that question in the affirmative. Second, given the history of abuse and the circumstances of this particular case, was there sufficient evidence that the defendant was in imminent danger of grievous bodily harm so as to warrant a self-defense instruction? Because the record before us is insufficient to answer this question, we remand for additional proceedings as set forth in this opinion.

## FACTS
Each of the residents of the Jaloveckas/Janes home could readily be identified as a victim. Certainly, Walter Jaloveckas

was the victim of homicide; there is also indication that his childhood was traumatic. The defendant, 17-year-old Andrew Janes, was abandoned by an alcoholic father at age 7, and then sporadically abused by Walter for 10 years. Andrew's mother, Gale, and his brother, Shawn, were also abused and shared the pain of these traumatic times. The abuse ended when Andrew shot and killed Walter. Yet, there is no doubt that the suffering continues and is in many ways greatly amplified by Walter's death.

In 1978, Walter began living with Gale, a single mother, and her young sons, Shawn and Andrew. The relationship was difficult from the beginning. Walter attempted to be a father figure to the boys and he helped support them financially. However, he was also subject to frequent outbursts of temper which sometimes resulted in severe physical and emotional abuse. As one of the trial experts testified, throughout his association with Walter, Andrew experienced "chronic and enduring abuse that he received as a child and as an adolescent", Report of Proceedings (RP), at 602, and "an unremitting pattern of episodic terror", RP, at 1495. Some of these incidents will be detailed below.

On August 30, 1988, Walter was shot and killed by Andrew. The events immediately leading to Walter's death began on the evening of August 29. Walter became upset after learning that one of his friends had been arrested and he began yelling at Gale. Andrew was present for a while, but then left to listen to music in his room. After tiring of the confrontation, Gale went to Andrew's room and told him to take his dirty clothes to the laundry room. Walter appeared shortly thereafter, and according to Gale's testimony, leaned his head into Andrew's room and spoke to him in a low voice. Gale could not hear Walter's comments, but remarked that the low tone used by Walter was one usually reserved for threats. Andrew later told a psychiatrist that Walter criticized him but that he couldn't remember exactly what Walter had said. On the witness stand, Andrew was completely unable to recall the contents of Walter's comment.

When Andrew awoke at 5 a.m. on August 30, Walter had already gone to work. Gale mentioned to Andrew that Walter was still mad. One of Andrew's classmates, Eric Haukap, dropped by the Janes' home about 6:30 in the morning. Andrew showed Haukap a shotgun, and his friend watched as Andrew loaded it with five shells. Andrew then said that he was going to kill Walter. This threat was familiar to Andrew's friend, as he had made it several times before. Andrew hid the loaded shotgun and the two left to catch the bus to school. At school, Andrew smoked marijuana with some other students. He attended only two classes before leaving school to return home. No one else was at home.

Shortly after 2 o'clock that afternoon, Haukap and another classmate, Paul Roberg, went to Andrew's home. They told Andrew not to kill Walter because "it was stupid". RP, at 118. Andrew responded: "Well, I can get out of it, no problem". RP, at 132. Haukap also testified that Andrew's comments that day were similar to those Andrew had made on three earlier occasions. According to Haukap, Andrew was usually more talkative, but was "totally quiet" that day. The classmates left after about 15 minutes.

Although the sequence of the events immediately prior to the killing is unclear, the substance is not. Andrew testified that he remembered very little of what occurred after he returned home that morning. He did recall that he watched some television and later broke the lock off Walter's bedroom door to take some whiskey, marijuana, and a 9-millimeter pistol.[1] He also retrieved the loaded shotgun and put on Walter's bulletproof vest. After drinking whiskey and smoking marijuana, Andrew began to think about "the things that Walter Jaloveckas had done". RP, at 1555.

Andrew also recorded a statement on a microcassette recorder found on the living room entertainment center. The transcript of the tape is as follows:

---

[1]Walter, an occasional drug dealer, kept the bedroom door locked in order to protect his drug supply from Andrew. On previous occasions, Andrew had entered the room to steal drugs.

> I declare war on Walt and whoever else. I feel that what I am doing is right. He — Walter has made mine and my mom's life and my brother's life miserable. My mom is never happy. She doesn't smile anymore, and I can't handle this shit. My mom was trying to get him to stop doing drugs, dealing drugs. She's tried everything and he won't stop. There's nothing she can do. From his drug dealing I have become addicted. I've tried to quit, but I can't. And I don't want this in my life anymore. So I shall take care of the problem myself. Mom, if you find this, I hope you will forgive me. I'm doing this in your best wishes. I hope you will be happier without Walter. I think I'm going crazy, Mom. This shit has just been too much. If the police should find this before you, I'm not responsible for my actions. I do not know what I'm doing.

RP, at 367-68.

When Walter returned home at his normal time, around 4:30 p.m., Andrew shot him with the pistol as he came through the front door. According to the medical examiner, two shots hit Walter Jaloveckas: the first through his right eye and the second through his head as he fell.

Andrew then punched the buttons on the house alarm system to summon the police, the fire department, and a medical unit. When the police arrived, he began firing upon them. He also fired several random shots, hitting the house, the telephone, and Walter's car. In the course of these actions, Andrew wounded Mrs. Eve Flores, a passerby, and Mountlake Terrace police officer James Blackburn. After about 5 minutes, Andrew surrendered.

While being transported to jail, Andrew orally stated that he had shot Walter, and later gave the following written confession:

> I came home from second period from school and decided to take care of Walt. I hated the way he treated my mom, and she tried to stop him from dealing dope. She tried to stop him, but she couldn't. He always yelled and screamed at us and was violent to us once in awhile [sic]. He was nice when he was high, but he hated me. He was being an asshole most of the time. I did it to make my mom happy and free.

RP, at 483. At the trial, Andrew's mother testified that when she saw Andrew at the police station directly after the shooting he was throwing up, talking to himself, and he didn't recognize her.

Andrew later explained to mental health professionals his motivation and his actions prior to the killing. According to Dr. Carl Redick, Andrew stated that he was upset by the episode the night before, and that when he awoke, he felt weird. After returning home, Andrew watched TV, obtained the guns and drugs, and began to think about his situation. He concluded that he would kill Walter. Andrew also played some heavy metal tapes. Andrew stated to Dr. Redick that he knew he was going to kill Walter approximately an hour before it occurred.

Dr. Bruce Olson's testimony was similar. Andrew told Dr. Olson that he obtained the guns at about 4 p.m. after listening to "Creeping Death", a song by the heavy metal rock band Metallica. Andrew told Dr. Olson:

> [T]hen I got the shotgun. Then I knew I was going to shoot him because he hurt me, my mom, my brother and because I couldn't take it no more. After so many years you can only take so much. I got a bullet proof vest. I put it on.

RP, at 900. Andrew then loaded the guns and filled his pockets with ammunition. Andrew told Dr. Olson that he: "went back into the den, turned up the stereo, got psyched up. Music will help you do it. They write pretty bizarre stuff." RP, at 901. Andrew then recalled hearing Walter drive up and walk to the door. "I shot him right when he walked in the door". RP, at 901.

Andrew was charged with one count of first degree murder (premeditated) in killing Walter Jaloveckas, one count of assault in the second degree in firing the shotgun at police officers, and one count of assault in the second degree in firing the shotgun at Mrs. Eve Flores.

Andrew never disputed that he shot and killed Walter. Instead, at his jury trial, he offered two distinct defenses: First, that the homicide was justifiable self-defense, based on the history of abuse by Walter. Second, that his capacity to premeditate and to form intent was diminished by the abuse he had suffered and from his use of drugs and alcohol.

In support of Andrew's request for a self-defense instruction, Dr. Christopher Varley, a child psychiatrist, was called for

an offer of proof. This testimony, in large part, was repeated later before the jury. Dr. Varley testified that Andrew suffered from, *inter alia*, post-traumatic stress disorder (PTSD). This disorder was the result of "the chronic and enduring abuse that he received". RP, at 602. Dr. Varley testified that the number of physically abusive events over the 10-year period was difficult to define, and set the range at between 20 and 500 incidents. Emotional abuse in the form of criticism and rebuke extended over the life of the family. Dr. Varley testified that the PTSD impaired Andrew's capacity to premeditate.

As to Andrew's perception of being harmed on August 30, 1988, Dr. Varley stated that it was his opinion that Andrew feared imminent harm that day:

> It was my opinion that, again, based upon the several elements that I testified to yesterday, and owing to the presence of the diagnosis of post traumatic stress disorder, which in my opinion, developed as a result of the chronic and enduring abuse that he received as a child and as an adolescent, that one element that operated for Andy Janes was a perception that he was constantly in danger, and therefore, fearful of Walter Jaloveckas, that this was a state of mind that derived for this individual as a product of the multiple trauma that he experienced, the multiple assaults that he experienced, the longstanding abuse that he experienced from Mr. Jaloveckas. It's also my view that this chronic state of fearfulness was heightened to some extent owing to the incident that occurred the evening prior to the shooting.

RP, at 601-02. On the other hand, Dr. Varley noted that Andrew himself had specifically denied fearing imminent death at the hands of Walter. Dr. Varley attached considerable significance to Walter's unknown statement to Andrew the night before the homicide, noting that its "tonal quality" might have triggered fear. Dr. Varley concluded that in his opinion, Andrew was in a state of imminent danger on August 30, 1988.

The trial court denied the request for a self-defense instruction. The court specifically found that Walter's confrontation with Gale the night before, his unknown comment to Andrew that same night, and Gale's statement the next morning that Walter was still mad were insufficient to establish imminent

danger. As the trial judge stated, these events were too remote and insufficiently aggressive to justify a self-defense instruction:

> There's no evidence of anything that Walter did other than whisper and have a verbal confrontation with the mother the night before, and didn't, by the way, involve Andy Janes in the sense that he wasn't the object of the abuse. It was an argument between Mrs. Janes, the mother, and Walter Jaloveckas. He wasn't even the subject of that argument . . ..

RP, at 633.

The defense also proposed a diminished capacity instruction. The judge noted the acceptance of PTSD within the medical community and ruled that he would so instruct the jury. The court allowed additional expert testimony on this subject as well as the family history of abuse. The witnesses were limited to events personally observed and also witnessed by the defendant. The court also permitted testimony as to the effects of alcohol and drugs on the defendant.

At trial, the defense presented 14 witnesses in an extensive defense. The testimony documented a litany of abusive behavior by Walter toward Andrew and his family.[2] This abuse began when Andrew was still a young child. For example, at the age of 9, Andrew was caught shoplifting. Walter beat both Andrew and his brother Shawn with a belt or wire hanger, and a plastic piggy bank. The next day, a neighbor noticed welts on Andrew and contacted Child Protective Service (CPS). No action was taken. In approximately the same period, Walter hit Andrew in the mouth with a mop as punishment for improperly wringing it out. A week after Andrew's 10th birthday, in another incident, Walter smashed Andrew's stereo with a sledgehammer.

On several occasions, Walter assaulted Andrew in front of nonfamily members. For instance, testimony by Robin Miller, a family friend, indicated that in 1985 Walter punched Andrew in the face for failing to properly complete a homework assign-

---

[2] The precise date and nature of each incident of abuse over the 10-year period is difficult to pinpoint. There is some conflict in this regard in the testimony of the various witnesses.

ment. CPS was again called, but no action was taken. Miller saw other similar incidents where Walter "slugged" and "man-handled" Andrew, as well as "roughed him up".

These were not the only occasions where Walter mani-fested violence toward Andrew. Sometime in 1986, Andrew was doing dishes when Walter struck Andrew in the head, rendering the boy unconscious. This was done without warn-ing. Moreover, in the spring of 1988, Walter hit Andrew with a piece of firewood, again knocking him unconscious.

School officials also noted signs of abuse. In January 1987, a teacher at Andrew's school noticed that he had been crying, and after some investigation, called CPS. Andrew told school officials that Walter had beaten him because he did not complete his chores. Apparently the actual reason for the attack was that Andrew had stolen some of Walter's marijuana. In any event, the total testimony presented by the defense left no doubt that Walter's "punishments" went well beyond the pale of appropriate behavior.

Walter's verbal and emotional abuse of Andrew left less obvious scars. Throughout Andrew's childhood and adoles-cence, Walter threatened Andrew and his brother Shawn with violent physical punishment if they misbehaved. For instance, Walter threatened to nail Andrew's hands to a tree, brand Andrew's forehead, and take Andrew away from his mother by sending him to a boys' home. Other threat-ened punishments included placing Andrew's fingers on the hot wood stove, breaking Andrew's fingers with a ball peen hammer, and wrapping a crowbar around Andrew's head.

In addition to evidence of Andrew's abuse, there was tes-timony that Shawn had been beaten and abused. In fact, when Shawn was 16, Walter ordered him out of the family home. Gale was similarly abused by Walter, and during Christmas 1985, was choked by him. Walter also left no doubt regarding his ability to seriously injure other people. On one occasion, in the family's presence, he physically assaulted and threatened to kill a drug dealer.

In connection with the diminished capacity instruction, the defense presented expert testimony from Dr. Bruce Olson

and Dr. Christopher Varley. Dr. Olson is a clinical psychologist who examined Andrew over 10 hours, and spoke with Gale, Shawn, and others. Dr. Olson testified with reasonable medical certainty that Andrew suffered from PTSD. It was Dr. Olson's opinion that Andrew's capacity to premeditate on August 30, 1988, was impaired, but not absent. However, Dr. Olson testified that, in his opinion, at the time of the shooting, Andrew intended to do it. Dr. Olson stated that Andrew was also impaired by the use of alcohol[3] and drugs, but that Andrew took these drugs to get himself "psyched up" to shoot Walter. Dr. Olson testified at length about PTSD and its relation to child abuse, about Andrew's history of abusive treatment, and about the events of August 29 and 30. Dr. Olson's testimony lasted over a day and a half.

Dr. Varley offered further testimony regarding the atmosphere at the Janes' household, and discussed a letter which Gale said was from Walter. In the letter, Walter apologized to Gale for being overbearing, making their lives miserable and blaming others for his problems.

Dr. Varley also presented extensive testimony to the jury on PTSD and the psychological effects of prolonged child abuse. He testified that PTSD can arise from an extreme stressor such as prolonged abuse. For battered children in particular, abuse can represent a "profound kind of blow to how a person functions". RP, at 1182. Dr. Varley testified with reasonable medical certainty that Andrew's capacity to premeditate Walter's death was impaired and that the impairment was the result of PTSD. As a result of PTSD, Andrew had difficulties "learn[ing] other kinds of alternatives of making [the abuse] problem go away". RP, at 1222. Specifically, Dr. Varley explained to the jury why a person suffering from abuse-induced PTSD might be unable to run away, seek outside help, or resist an abuser. Dr. Varley also testified regarding Andrew's "hypervigilance" prior to the homicide. According to Dr. Varley, Walter's comments to

---

[3]Andrew's blood alcohol content was measured at .08 percent about 2 hours after the incident.

Andrew the night before the killing constituted "a signal [for Andrew] that it was time to be vigilant and that he might be attacked by Walter Jaloveckas." RP, at 1225. Dr. Varley believed that Andrew acted to stop the abuse in the only way Andrew believed he could.

In rebuttal, the State called Dr. Carl Redick, a psychologist at Western State Hospital. Dr. Redick testified that he evaluated Andrew pursuant to a court order as to his competency, sanity, diminished capacity, and capacity to premeditate. Dr. Redick also spoke to Gale and Shawn and reviewed the case history as well as the reports of the other doctors. He spent 8 to 10 hours with the defendant. Dr. Redick concluded that Andrew suffered from long-term substance abuse, including alcohol, LSD, and marijuana. Dr. Redick further testified that Andrew had the capacity to premeditate on August 30, 1988, and that he did not suffer from PTSD.

In accord with its earlier ruling, the trial court did not give a self-defense instruction. The jury found Andrew not guilty of first degree murder, but found him guilty of second degree murder, and guilty of two counts of second degree assault. The court imposed a reduced exceptional sentence of 120 months confinement on the murder count, and 20 months confinement for each of the assault counts, to be served concurrently.[4] The lower sentence was based upon the following conclusions of law: Andrew suffered a continuing course of physical abuse by the victim and his crime was in response to that abuse; Andrew's capacity to conform his conduct to the requirements of the law was significantly impaired by post-traumatic stress disorder and as to the assaults, by his intense, involuntary, psychological and emotional reaction to the consequences of his conduct in the murder count; Andrew truly, though wrongly, perceived his actions in killing Walter as the only way he could stop the abuse of himself and his mother, thus he acted under duress and compulsion (which

---

[4]The standard range for the offenses would have been 165 to 219 months for the second degree murder conviction and 15 to 20 months for each of the assault convictions. Clerk's Papers, at 4.

was insufficient to constitute a complete defense); and Mr. Jaloveckas was, to a significant degree, an initiator, aggressor, and provoker of the incident by his physical and psychological abuse of Andrew and his family for a period of years before the incident.

The Court of Appeals reversed Andrew's second degree murder conviction. It held that the trial court erred in failing to instruct the jury on self-defense. *State v. Janes*, 64 Wn. App. 134, 136, 822 P.2d 1238 (1992). We accepted review.

## BATTERED CHILD SYNDROME

The first question raised in this case is if expert testimony regarding the "battered child syndrome" is generally admissible in appropriate cases to aid in the proof of self-defense. Increasingly, children accused of parricide have sought to introduce evidence of this psychological theory in an effort to explain their actions. Joëlle Anne Moreno, *Killing Daddy: Developing a Self-Defense Strategy for the Abused Child*, 137 U. Pa. L. Rev. 1281, 1285 (1989). The admissibility of the battered child syndrome is a question of first impression in Washington.

■■ The process for determining the admissibility of novel scientific evidence involves a 2-part inquiry. First, does the proposed testimony satisfy the *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923) standard for admissibility of novel scientific evidence? And second, if so, is expert testimony on this syndrome properly admissible under ER 702? *State v. Cauthron*, 120 Wn.2d 879, 885, 846 P.2d 502 (1993).

The first part of the admissibility inquiry, known as the *Frye* test, is well established:

> [E]vidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.

*State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984). In applying this test, our purpose is not to second-guess the scientific community. Instead, "[t]his inquiry turns on the

level of recognition accorded to the scientific principle involved — we look for *general acceptance* in the appropriate scientific community." *Cauthron*, at 887. We review the trial court's decision to admit novel scientific evidence de novo. *Cauthron*, at 887.

Originally developed as a physical diagnosis for describing child abuse, the "battered child syndrome" has come to describe both the physiological and psychological effects of a prolonged pattern of physical, emotional and sexual abuse. *See generally* Steven R. Hicks, *Admissibility of Expert Testimony on the Psychology of the Battered Child*, 11 L. & Psychol. Rev. 103, 108-11 (1987). Such abuse typically lasts over a significant period of time and tends to operate in recurring patterns.

Victims of chronic abuse suffer from a general psychological disorder known as post-traumatic stress disorder. PTSD is an anxiety-related disorder which occurs in response to traumatic events outside the normal range of human experience. As Dr. Olson testified at trial, child abuse "is an extreme stressor that exceeds a child's capacity to cope with it or integrate it into their personality, their awareness, their consciousness." RP, at 781. Although PTSD is classified as a mental disorder, "it is one of the few kinds of psychiatric disorders that is considered a *normal response* to an *abnormal situation.*" Paul A. Mones, *When a Child Kills: Abused Children Who Kill Their Parents* 63 (1991).

The resulting psychological response to abuse-induced PTSD is often referred to as the "battered child syndrome".[5] One principal characteristic of the syndrome is hypervigilance:

---

[5]At trial, the experts testified as to the effects of PTSD on chronically abused children. This psychological disorder is often referred to as the "battered child syndrome". Although this term has not been officially adopted by the psychiatric community, use of the term has "persisted" as a popular denomination for courts and researchers. Steven R. Hicks, *Admissibility of Expert Testimony on the Psychology of the Battered Child*, 11 L. & Psychol. Rev. 103, 111 (1987). Likewise, we will use this term throughout the opinion to describe the psychological effects of abuse-induced PTSD in children.

> Battered children, unlike those children who are not abused, live in an environment where abuse is commonplace and may occur at anytime with or without warning. Battered children, therefore often appear to be what researchers have termed as "hypervigilant." Such a hypervigilant child is acutely aware of his or her environment and remains on the alert for any signs of danger, events to which the unabused child may not attend. The child's history of abusive encounters with his or her battering parent leads him or her to be overly cautious and to perceive danger in subtle changes in the parent's expressions or mannerisms. Such "hypermonitoring" behavior, as it has been termed, means the child becomes sensitized to these subtle changes and constantly "monitors" the environment (particularly the abuser) for those signals which suggest danger is imminent.

(Footnote omitted.) Hicks, at 103-04. Children who suffer from prolonged abuse develop "a very finely tuned antenna for impending violence [which] . . . picks up low-level cues that people who have not been traumatized would not see." Mones, at 63 (quoting Dr. Lenore Walker).

Another key characteristic of the syndrome is known as "learned helplessness". Although the common expectation might be for the abused child to seek outside help, "there are compelling psychological reasons that make seeking and getting help the rare exception, not the norm." Mones, at 33. For children in particular, such a phenomenon is especially severe. Oftentimes, abused children will have sought outside help from authority figures, as the record indicates Andrew did, without gaining any satisfactory outcome. Other persons within the family are unable to help because they frequently suffer abuse as well. Running away is not a realistic option. In the end, for the battered child, all doors of escape appear closed.

Although this court has not ruled on the admissibility of the battered child syndrome,[6] we have previously allowed another related syndrome which presents a particularly close

---

[6]Washington courts have admitted the "battered child syndrome" for purposes of proving a physical pattern of child abuse. *See State v. Toennis*, 52 Wn. App. 176, 758 P.2d 539, *review denied*, 111 Wn.2d 1026 (1988); *State v. Mulder*, 29 Wn. App. 513, 629 P.2d 462 (1981). However, this case is the first in our jurisdiction to address the use of this syndrome for demonstrating the psychological effects of prolonged abuse in a self-defense context.

parallel to the battered child syndrome. In *State v. Allery*, 101 Wn.2d 591, 682 P.2d 312 (1984), we recognized the battered woman syndrome. Both syndromes find their basis in abuse-induced PTSD and elicit a similar response from the abuse victim. For purposes of the *Frye* test, we can see no reason to treat these two syndromes differently. Given the close relationship between the battered woman and battered child syndromes, the same reasons that justify admission of the former apply with equal force to the latter. As one commentator has noted:

> [T]he battered woman syndrome and the battered child syndrome constitute a single psychological disorder for purposes of expert testimony. . . . [T]he differences between the two groups are negligible.

Hicks, at 106; *see also* Diana J. Ensign, Note, *Links Between the Battered Woman Syndrome and the Battered Child Syndrome: An Argument for Consistent Standards in the Admissibility of Expert Testimony in Family Abuse Cases*, 36 Wayne L. Rev. 1619 (1990).

If anything, for battered children, the effects of PTSD are amplified. Children are entirely dependent on the parent for financial and emotional support. They are extremely vulnerable and tend to place great trust in their parents. It is not as easy for a child as it is for an adult to leave a troubled home. *See* RCW 13.32A (Family Reconciliation Act). Moreover, unlike the battered adult, a child has no outside context with which to compare the abusive reality. For these reasons, we conclude that the battered child syndrome is the functional and legal equivalent of the battered woman syndrome, and find that it is admissible under the *Frye* test.

The second part of the admissibility inquiry is governed by ER 702. This rule provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 702. Satisfaction of the ER 702 requirements involves a 2-part inquiry: (1) Does the witness qualify as an expert,

and (2) Would the expert testimony be helpful to the trier of fact. *Cauthron,* 120 Wn.2d at 890.

The qualifications of the experts who testified at Andrew's trial were not questioned. As to the other ER 702 inquiry, the same reasons that rendered evidence of the battered woman syndrome helpful to the jury in a self-defense case again apply with equal force to the battered child evidence. Expert testimony regarding the syndrome helps the jury to understand the reasonableness of the defendant's perceptions:

> Without the aid of expert testimony on the psychology of battered children, the jury will be unable to appreciate the manner in which the abused child differs from the unabused child. Specifically, the jury will be uninformed as to the difference in the way battered children perceive things in their immediate surroundings and react to those perceptions. Expert testimony can help the jury understand the sense of powerlessness, fear, and anxiety which permeate the battered child's world.
>
> The expert testimony, therefore, will aid the jury in evaluating the manner in which a battered child perceives the imminence of danger and his or her tendency to use deadly force to repel that danger.

(Footnotes omitted.) Hicks, at 104. The jury can then use such knowledge to determine whether the defendant's belief that he was in imminent danger of serious bodily injury or loss of life was reasonable under the circumstances. *Allery,* at 597.

We hold, therefore, that as a general matter, evidence of the battered child syndrome is admissible to help prove self-defense whenever such a defense is relevant. The underlying principles of the battered child syndrome are generally accepted in the scientific community and satisfy the ER 702 requirements by helping the trier of fact to understand a little-known psychological problem.

### SELF-DEFENSE

The second question before us is, given the history of abuse and other circumstances, was there sufficient evidence that the defendant was in imminent danger of grievous bodily harm so as to warrant a self-defense instruction.

The defense relied on expert testimony that Andrew suffered from battered child syndrome. It also pointed to Walter's argument with Gale the night prior to the shooting, Walter's comments to Andrew in a "low voice", and Gale's warning to Andrew on the following morning that Walter was still mad. The trial court ruled, as a matter of law, that a justifiable homicide instruction was unavailable because the events of the prior night and the morning of the killing were too far removed and lacked sufficient aggressiveness to constitute imminent danger.

■ In Washington, self-defense is defined by statute. Under RCW 9A.16.050 homicide is justifiable when committed:

> In the lawful defense of the slayer . . . when there is reasonable ground to apprehend a design on the part of the person slain . . . to do some great personal injury to the slayer . . . and there is imminent danger of such design being accomplished[.]

Self-defense finds its basis in necessity and generally ends with the cessation of the exigent circumstance which gave rise to the defensive act. *United States v. Peterson*, 483 F.2d 1222, 1229 (D.C. Cir.), *cert. denied*, 414 U.S. 1007 (1973). A self-defense claim is "predicated upon the right of every citizen to reasonably defend himself against unwarranted attack." *Whipple v. State*, 523 N.E.2d 1363, 1366 (Ind. 1988).

■ In order to raise self-defense before the jury, a defendant bears the initial burden of producing some evidence which tends to prove that the killing occurred in circumstances amounting to self-defense. *State v. Acosta*, 101 Wn.2d 612, 619, 683 P.2d 1069 (1984); *State v. McCullum*, 98 Wn.2d 484, 488, 656 P.2d 1064 (1983) (plurality by Williams, J.). "Although it is essential that some evidence be admitted in the case as to self-defense, there is no need that there be the amount of evidence necessary to create a reasonable doubt in the minds of jurors on that issue." *McCullum*, at 488. Nonetheless, while the threshold burden of production for a self-defense instruction is low, it is not nonexistent. For the jury to be instructed on self-defense, the defendant must produce some evidence regarding the statutory elements of a reasonable apprehension of great bodily harm, and imminent danger. RCW 9A.16-.050.

■ The longstanding rule in this jurisdiction is that evidence of self-defense must be assessed from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees. *State v. Allery*, 101 Wn.2d 591, 594, 682 P.2d 312 (1984). As we stated in *State v. Wanrow*, 88 Wn.2d 221, 235-36, 559 P.2d 548 (1977):

> [Jurors are to] put themselves in the place of the appellant, get the point of view which he had at the time of the tragedy, and view the conduct of the [deceased] with all its pertinent sidelights as the appellant was warranted in viewing it. In no other way could the jury safely say what a reasonably prudent [person] similarly situated would have done.

(Plurality of Utter, J.) (quoting *State v. Tribett*, 74 Wash. 125, 130, 132 P. 875 (1913)). The trial court must evaluate the evidence from this same point of view if it is to properly determine whether the defendant has produced some evidence of self-defense.[7]

By evaluating the evidence from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees, our approach to reasonableness incorporates both subjective and objective characteristics. It is subjective in that the jury is "entitled to stand as nearly as practicable in the shoes of [the] defendant, and from this point of view determine the character of the act." *Wanrow*, at 235 (quoting *State v. Ellis*, 30 Wash. 369, 373, 70 P. 963 (1902)); *Allery*, at 594. Also, the jury is to consider the defendant's actions in light of *all* the facts and circumstances known to the defendant, even those substantially predating the killing. *Allery*, at 594; *Wanrow*, at 234-36. The self-defense evaluation is objective in that the jury is to use this information in determining "what a reasonably prudent [person] similarly situated would have done." *Wanrow*, at 236 (quoting *State v. Tribett*, 74 Wash. 125, 130, 132 P. 875 (1913)); *Allery*, at 594.

---

[7]The question of whether the defendant has produced sufficient evidence to raise a claim of self-defense is a matter of law for the trial court. *State v. Walker*, 40 Wn. App. 658, 662, 700 P.2d 1168, *review denied*, 104 Wn.2d 1012 (1985).

By learning of the defendant's perceptions and the circumstances surrounding the act, the jury is able to make the "*critical determination* of the 'degree of force which . . . a reasonable person in the same situation . . . seeing what [s]he sees and knowing what [s]he knows, then would believe to be necessary.' " (Italics ours.) *Wanrow*, at 238 (quoting *State v. Dunning*, 8 Wn. App. 340, 342, 506 P.2d 321 (1973)); *see also State v. Hughes*, 106 Wn.2d 176, 189, 721 P.2d 902 (1986); *State v. Theroff*, 95 Wn.2d 385, 390, 622 P.2d 1240 (1980). Stated differently, the jury is to inquire whether the defendant acted reasonably, given the defendant's experience of abuse. Expert testimony on the battered person syndromes is critical because it informs the jury of matters outside common experience. Once the jury has placed itself in the defendant's position, it can then properly assess the reasonableness of the defendant's perceptions of imminence and danger.

This approach to self-defense provides balance to our jurisprudence. The subjective aspects ensure that the jury fully understands the totality of the defendant's actions from the defendant's own perspective. Such a consideration is especially important in battered person cases. As one court has explained:

> The subjective perceptions of an individual, brutalized regularly by domestic violence, are especially critical to the determination of whether her actions in purported self-defense were reasonable. Victims of a battering relationship live in a hopeless vacuum of "cumulative terror."

(Citations omitted.) *State v. Gallegos*, 104 N.M. 247, 250, 719 P.2d 1268 (Ct. App. 1986).

■ The objective portion of the inquiry serves the crucial function of providing an external standard. Without it, a jury would be forced to evaluate the defendant's actions in the vacuum of the defendant's own subjective perceptions. In essence, self-defense would always justify homicide so long as the defendant was true to his or her own internal beliefs. As Professor Susan Estrich has remarked:

[I]f the reasonable person has all of the defender's characteristics, the standard loses any normative component and becomes entirely subjective. Applying a purely subjective standard in all cases would give free rein to the short-tempered, the pugnacious, and the foolhardy who see threats of harm where the rest of us would not and who blind themselves to opportunities for escape that seem plainly available. These unreasonable people may not be as wicked as (although perhaps more dangerous than) cold-blooded murderers . . . but neither are they, in practical or legal terms, justified in causing death.

*Defending Women*, 88 Mich. L. Rev. 1430, 1435 (1990) (reviewing Cynthia Gillespie, *Justifiable Homicide: Battered Women, Self-Defense and the Law* (1989)). The objective aspect also keeps self-defense firmly rooted in the narrow concept of necessity. No matter how sound the justification, revenge can never serve as an excuse for murder. "[T]he right of self-defense does not imply the right of attack in the first instance or permit action done in retaliation or revenge." *People v. Dillon*, 24 Ill. 2d 122, 125, 180 N.E.2d 503 (1962). Even when justifiable, homicide is an irreversible act.

■ In evaluating the reasonableness of the defendant's belief in imminent danger, the battered child syndrome is of considerable assistance in helping the jury understand the circumstances surrounding the homicide. As this court explained in regard to the battered woman syndrome:

expert testimony explaining why a person suffering from the battered woman syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself would be helpful to a jury in understanding a phenomenon not within the competence of an ordinary lay person.

*State v. Allery*, 101 Wn.2d 591, 597, 682 P.2d 312 (1984). As Dr. Varley testified in the current case, after undergoing years in an abusive relationship, a battered child develops a heightened sense of awareness regarding the pattern of abuse which the average person might overlook.

Nonetheless, testimony that a defendant suffers from the *battered child syndrome, standing alone, does not ensure* that the defendant's belief in imminent harm was reasonable. "That the defendant is a victim of a battering relation-

ship is not alone sufficient evidence to submit the issue of self-defense to a jury." *State v. Walker*, 40 Wn. App. 658, 665, 700 P.2d 1168, *review denied*, 104 Wn.2d 1012 (1985); *Whipple*, 523 N.E.2d at 1367; *Gallegos*, at 250. In short, the existence of the battered child syndrome does not eliminate the defendant's need to provide some evidence that his or her belief in imminent danger was reasonable at the time of the homicide.

The concept of imminence was well defined by the Court of Appeals in *Walker*:

> The evidence must establish a confrontation or conflict, not instigated or provoked by the defendant, which would induce a reasonable person, considering all the facts and circumstances known to the defendant, to believe that there was *imminent danger* of great bodily harm about to be inflicted.

40 Wn. App. at 662. Imminence does not require an actual physical assault. *Walker*, 40 Wn. App. at 663. A threat, or its equivalent, can support self-defense when there is a reasonable belief that the threat will be carried out. *State v. Adamo*, 128 Wash. 419, 426, 223 P. 9 (1924); *State v. Negrin*, 37 Wn. App. 516, 521, 681 P.2d 1287, *review denied*, 102 Wn.2d 1002 (1984). Especially in abusive relationships, patterns of behavior become apparent which can signal the next abusive episode. *Gallegos*, 104 N.M. at 250.

It is also important to distinguish "imminent harm" from "immediate harm". These two words have divergent meanings:

> **imminent** . . . ready to take place : near at hand : . . . hanging threateningly over one's head : menacingly near . . .
>
> **immediate** . . . occurring, acting, or accomplished without loss of time : made or done at once . . .

*Webster's Third New International Dictionary* 1130, 1129 (1976). The statute only requires that the harm faced by the defendant be imminent. RCW 9A.16.050. That the triggering behavior and the abusive episode are divided by time does not necessarily negate the reasonableness of the defendant's perception of imminent harm. Even an otherwise innocuous comment which occurred days before the homicide could be

highly relevant when the evidence shows that such a comment inevitably signaled the beginning of an abusive episode.

Applying these concepts to the case before us, we conclude that the trial court's consideration of the motion for a self-defense instruction was incomplete. The trial court denied the requested instruction because it believed that the comments of Walter the night prior to, and the warning of Andrew's mother the morning of, the homicide were not sufficiently aggressive and were too far removed from the homicide to justify a self-defense instruction. However, there is nothing in the record before us which indicates that the trial court considered the defense evidence in light of Andrew's subjective knowledge and perceptions. In the defendant's offer of proof, there was considerable evidence as to the interaction between long-term abuse, self-defense and the battered child syndrome. Also, the trial court may have given undue consideration to the length of time between the alleged threat and the homicide; the justifiable homicide statute requires imminence, not immediacy.

Thus, we are unable to determine if this evidence was properly considered and evaluated by the trial court in denying the proposed instruction. We therefore remand this case to the trial court. On remand, the trial court is to reconsider its ruling denying the self-defense instruction in light of the principles discussed in this opinion. If the trial court determines that some evidence existed to justify a self-defense instruction, then it should order a new trial. Otherwise, Andrew's conviction stands, subject to a continuation of the normal appeals process.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, SMITH, GUY, and JOHNSON, JJ., concur.