# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49676-3-II |
| Respondent, | |
| v. | |
| A.P.,† | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — AP appeals his juvenile bench trial conviction for second degree assault. He contends that the trial court denied his constitutional right to present his self-defense claim. AP argues, and the State agrees, that the trial court improperly excluded evidence of the victim's prior threats toward AP as hearsay. AP contends this error was not harmless beyond a reasonable doubt because the trial court was unable to determine the reasonableness of AP's fear of the victim and the reasonableness of the force used without knowing the substance of the victim's prior threats. The State contends the error was harmless because AP exceeded reasonable force when AP used a knife in a fistfight. Because the trial court improperly excluded evidence highly relevant to and probative of AP's self-defense claim, we reverse and remand for a new trial.

---

† We use AP's initials because a commissioner of this court granted AP's motion to use his initials in the case name and briefing.

FACTS

I. State's Testimony[1]

The State called 10 witnesses, including the victim, DF[2]; Jordan Herrera, AP's girlfriend; numerous eyewitnesses; and law enforcement officers who worked on the case.

A. DF's Testimony

AP and DF were acquaintances. Both were juveniles during the relevant time. Several weeks before this incident, AP was intoxicated and asked DF about his prior sex offense charges. DF was "very furious" when AP brought up the issue. Report of Proceedings (RP) (Oct. 31, 2016) at 11. On four occasions, DF confronted AP at a park and asked AP to leave him alone and to stop telling others about his past. On one occasion, DF yelled at AP, saying he would "not hesitate to fight [AP] if it ever came to it." RP (Oct. 31, 2016) at 12. DF also stated he may have yelled and clenched his fists in his prior interactions with AP.

On July 25, DF was at a Thurston County park with between 5 and 10 friends and acquaintances when he saw AP and his girlfriend, Herrera, approaching the group. DF approached AP before AP reached the group, asking what AP wanted and telling him to leave. DF told AP that he did not want "any issues" but would "defend" himself if necessary. RP (Oct. 31, 2016) at 17. The group was about 20 to 30 feet away from where DF, AP, and Herrera stood.

---

[1] After the bench trial, the trial court failed to enter the required written findings of fact and conclusions of law. *State v. Head*, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998). Because neither party challenges the trial court's failure to enter written findings and both parties rely on the trial testimony, we do so as well.

[2] We use initials to protect the privacy of victims under 18 years of age.

Herrera stepped in front of AP, saying to DF, "'You're not going to hit me.'" RP (Oct. 31, 2016) at 13. DF testified that "maybe [Herrera] thought I was going to attack [AP]." RP (Oct. 31, 2016) at 13. DF told Herrera that he would not hit her because he does not hit women. DF asked the group to move Herrera out of the way, but no one responded. Then DF pushed Herrera to the side, "started stepping at [AP]," and told AP he needed to leave. RP (Oct. 31, 2016) at 15.

After DF pushed Herrera, AP made "a movement of attacking," and DF "started swinging." RP (Oct. 31, 2016) at 15. At some point, DF thought he may have hit Herrera when she tried to intervene. Then AP stabbed DF in the chest, and DF collapsed.

### B. HERRERA'S TESTIMONY

Herrera and AP were at the park when they decided to approach a group of acquaintances. The couple did not know that DF was in the group as they approached. When Herrera and AP were approximately 15 to 20 feet away from the group, DF started walking towards them, yelling at them to leave the park and get out of his space. Herrera knew that AP and DF had argued in the past about DF's prior criminal record.

AP and Herrera told DF that he should "'[c]hill out'" and that "'we're not trying to start any problems.'" RP (Oct. 31, 2016) at 39. DF asked Herrera if she knew what AP was saying about DF's criminal record. Herrera said it was none of her business and she did not want to be a part of it. DF then said that Herrera was "the only reason" DF hadn't hit AP. RP (Oct. 31, 2016) at 39. Then Herrera stepped in front of AP "because [DF] said he was going to hit [AP]." RP (Oct. 31, 2016) at 39-40.

DF was "trying to get . . . some other people to fight" Herrera and get her out of the way, but no one responded to his request. RP (Oct. 31, 2016) at 40. AP and Herrera started to turn to

leave when DF "lung[ed]" at AP. RP (Oct. 31, 2016) at 41. DF pushed Herrera out of the way, swung at AP, and hit Herrera in the back of the head. Herrera was briefly turned away from the fight and when she turned toward them again, AP and DF were "chest to chest." RP (Oct. 31, 2016) at 41. Then, AP walked away and DF fell down.

## C. EYEWITNESS TESTIMONY

There were between 20 and 30 people in DF's group. The eyewitnesses were acquainted with AP and Herrera, but they were not friends. Several eyewitnesses were DF's friends, and one was DF's brother.

When AP and Herrera approached the group, AP said he did not want any trouble and told the group he was looking to buy marijuana. Some from the group responded that they did not want to sell marijuana to AP and they did not like him. The group remained about 15 to 20 feet away from DF and AP.

DF stood up, walked toward AP, and yelled that AP needed to leave. The group was aware that AP and DF were arguing, and some expected it to result in a fistfight. One witness saw Herrera standing in front of AP and thought she did so "because she didn't want [DF] to, like, do anything to [AP] or [AP] to do anything to [DF]." RP (Oct. 31, 2016) at 108. AP and DF engaged in a physical altercation, including an exchange of punches, and at some point Herrera was hit with a punch when she tried to intervene. Then AP stabbed DF in the chest.

DF got up, grabbed a stick, ran towards AP, threw the stick towards AP and Herrera, and then fell again. Some of DF's friends then beat up AP while others tended to DF.

## D. Law Enforcement Testimony

Police responded to the stabbing, and AP told police that he stabbed DF because DF hit Herrera. AP also said that he feared DF and did not believe he could win a hand-to-hand fight with DF. In addition, AP stated that he used his knife instinctually. During the police interview, AP did not mention that he was afraid of the group.

A detective described the knife found at the scene, which had a four-and-a-half-inch blade with a "fishhook-type tip on it." RP (Oct. 31, 2016) at 126. The detective interviewed DF at the hospital soon after the incident and, while DF was being bandaged, observed a "one-inch-long by one-inch-depth scar on his chest" consistent with the knife used to stab DF. RP (Oct. 31, 2016) at 127.

## II. Defense Testimony

AP was the sole witness for the defense. According to AP, he and DF had confrontations throughout the month regarding DF's alleged criminal record. Defense counsel asked AP about DF's threats made during a prior confrontation regarding DF's criminal record. The State raised a hearsay objection. Defense counsel argued that the threats were not hearsay because they were not offered to prove the truth of the matter asserted, but instead to support the self-defense claim and show that AP was afraid of DF. The trial court sustained the State's objection, saying it was unaware of any exception that would allow the threats' admission. The trial court did not allow additional testimony regarding DF's threats to AP. Defense counsel did not make an offer of proof outlining the specific testimony he wished to present regarding DF's prior threats.[3]

---

[3] Because the State does not argue that AP's failure to make an offer of proof waived AP's evidentiary argument on appeal, we discuss it no further.

According to AP, he and Herrera approached a group of acquaintances across the park and did not realize DF was in the group. DF walked toward AP and Herrera with his fists clenched, yelling that AP needed to leave.

AP ignored DF and told the group he was looking to buy marijuana, but no one responded. AP turned and began to walk away. However, Herrera did not follow AP. Herrera stepped in between AP and DF, and DF asked if someone could move her. AP realized Herrera was not with him and walked back to stand behind Herrera. DF hit Herrera and moved towards AP with raised fists as if he was about to attack. DF punched at AP.

AP was "afraid" and "scared" for himself and Herrera. RP (Oct. 31, 2016) at 145-46. He said, "I'm imagining [me and DF] getting in an altercation, me potentially being rendered unconscious or otherwise incapacitated and him pursuing Ms. Herrera afterwards or continuing to attack me while I was incapacitated." RP (Oct. 31, 2016) at 148. He drew his knife and stabbed DF, aiming for DF's shoulder. AP said he was afraid, in part, because 10 to 15 of DF's "[g]ood friends" were standing nearby, and "any time they felt necessary, they would jump in for [DF's] benefit." RP (Oct. 31, 2016) at 146. After AP stabbed DF, AP was attacked by some people from the group.

### III. CLOSING ARGUMENTS

The State argued, "[T]his case is a question of whether or not [AP] exercised reasonable force and lawful force in response to this situation." RP (Oct. 31, 2016) at 171-72. The State acknowledged that AP and DF had some tense interactions before the stabbing and that DF had stated he was willing to defend himself from AP if necessary. But the State argued that AP did

not actually fear the group, as evidenced by the fact that he approached them asking for marijuana and that no one in the group threatened to join the fight.

In addition, the State argued that AP stabbed DF to retaliate for pushing and punching Herrera and not because AP feared DF. And the State argued that AP's stabbing "clearly exceeds any lawful force that should be granted to someone in that circumstance, as any reasonable person in those circumstances . . . would not find it prudent and justifiable to take a dangerous weapon and, you know, stab another individual under those circumstances." RP (Oct. 31, 2016) at 180.

The State noted that AP was lucky that DF "did not incur more serious injuries and he survived." RP (Oct. 31, 2016) at 171. The State described DF's stab wound as "dangerously close to a number of parts of his body that could have created a significant injury." RP (Oct. 31, 2016) at 190.

Defense counsel argued that the State had failed to meet its burden to prove beyond a reasonable doubt that AP did not act in self-defense. Defense counsel argued that DF was yelling and angry, DF made the first punch, and DF himself admitted that it may have appeared he was trying to fight. He argued that, in pushing Herrera, DF was attempting to gain access to AP. And he argued that DF's aggressive actions towards AP and Herrera, coupled with the large group of DF's friends standing nearby, made AP's defensive response reasonable.

## IV. TRIAL COURT'S RULING

The trial court found AP guilty of second degree assault. The trial judge rejected the self-defense claim. He said that DF did not present a threat to justify the stabbing because DF's friends were not concerned or paying attention to the interaction between DF and AP. The trial court also found that AP's statements to the police, his testimony, and other witnesses' testimony were

7

inconsistent. The trial court stated, "[M]y sense from all the evidence is that [AP] used the knife not so much to protect himself or even Ms. Herrera but, rather, to retaliate against [DF] for using his hand to move Ms. Herrera out of the way." RP (Oct. 31, 2016) at 198.

The trial court acknowledged that a person may use in self-defense the same force as "a reasonably prudent person . . . under the same or similar conditions as they appeared to the person, taking into consideration all the facts and circumstances known to the person at the time of and prior to the incident." RP (Oct. 31, 2016) at 198. The trial court did not make findings regarding the facts and circumstances known to AP at the time. Instead, the trial court said that the force used by AP went beyond the threat presented by DF and was more than was necessary to defend AP and Herrera. AP appeals.

ANALYSIS

I. RIGHT TO PRESENT EVIDENCE OF SELF-DEFENSE

AP argues, and the State does not contest, that AP's federal Sixth Amendment right to present a defense was denied when the trial court excluded DF's prior threats under an erroneous hearsay standard.[4] However, the parties dispute whether the error was harmless. We hold that the error was not harmless beyond a reasonable doubt.

---

[4] AP offered the prior threats to show their effect on AP's mental state, including the reasonableness of his fear of DF, and not to prove the truth of the matter asserted. Thus, the prior threats were not hearsay. *State v. Rice*, 120 Wn.2d 549, 564, 844 P.2d 416 (1993). The trial court abused its discretion because it excluded the threats based on an erroneous hearsay standard. *See State v. Smith*, 148 Wn.2d 122, 135-37, 59 P.3d 74 (2002). The exclusion of this evidence prevented consideration of probative evidence regarding AP's defense without an appropriate justification, so AP's Sixth Amendment right to present a defense was violated. *See State v. Cayetano-Jaimes*, 190 Wn. App. 286, 297-98, 303, 359 P.3d 919 (2015). Thus, we accept the State's concession that the trial court erred.

A.  PRINCIPLES OF LAW

A trial court's violation of a defendant's constitutional right to present a defense is a constitutional error.  *State v. Jones*, 168 Wn.2d 713, 719-21, 724, 230 P.3d 576 (2010). Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless. *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007).  A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error.  *Watt*, 160 Wn.2d at 635.[5]

The defendant has the initial burden to produce some evidence demonstrating self-defense. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997).  Once the defendant meets this burden, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense.  *Walden*, 131 Wn.2d at 473.

Evidence of self-defense is evaluated from the perspective of the "'reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees.'"  *Walden*, 131 Wn.2d at 474 (quoting *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993)).  This standard incorporates an analysis of both objective and subjective elements.  *Walden*, 131 Wn.2d at 474. "The subjective portion requires the [trier of fact] to stand in the shoes of the defendant and consider all the facts and circumstances known to him or her; the objective portion requires the [trier of fact] to use this information to determine what a reasonably prudent person similarly situated would have done."  *Walden*, 131 Wn.2d at 474.

---

[5] The parties agree that the exclusion of relevant evidence under an erroneous hearsay standard is a constitutional error in this case because it affected AP's ability to present his self-defense claim. As such, we review under the heightened standard for constitutional errors.  *Watt*, 160 Wn.2d at 635.

Self-defense justifies the degree of force that a reasonably prudent person would find necessary under only the conditions as they appeared to the defendant, considering the defendant's knowledge and circumstances. *Janes*, 121 Wn.2d at 239.

### B. EVALUATING AP'S SUBJECTIVE FEAR OF DF

AP argues that his entire defense turned on AP's reasonable fear that DF was going to assault him, and the trial court's exclusion of DF's prior threats was highly prejudicial because AP could not show that DF's threats increased AP's fear of harm and that his use of force was reasonable under the circumstances. We agree.

The State mischaracterizes AP's argument by asserting that "the excluded testimony would have referenced past threats made by [DF] in order to establish that [AP] was subjectively *afraid for his life*." Br. of Resp't at 3 (emphasis added). AP never argues that the excluded statements would support that he feared for his life. Rather, AP argues on appeal, as he did at trial, that the prior threats were relevant to whether AP feared an assault and whether his use of force was reasonable under the circumstances. To the extent that the State argues that AP was not afraid for his life, the State fails to respond to AP's self-defense claim.

The State argues that, regardless of the nature of DF's threats, the evidence proves beyond a reasonable doubt that AP was not afraid of DF because he *willingly* approached DF at the park and asked the group for drugs immediately before the altercation. However, the State's argument fails because the claim that AP willingly approached DF misrepresents the record. As AP asserts, the trial testimony shows that AP and Herrera approached the group at the park *without realizing* DF was present. As such, AP's decision to approach the group is not probative of whether AP

feared DF or whether he used the degree of force that a reasonably prudent person would find necessary under AP's circumstances. *Janes*, 121 Wn.2d at 239.

Contrary to the State's assertion, the prior threat evidence supports the subjective prong of AP's self-defense claim, which requires consideration of the totality of AP's *knowledge* and circumstances at the time of the stabbing. *Walden*, 131 Wn.2d at 474. Some evidence supports that AP stabbed DF because he was afraid DF would harm him, and the trial court may have evaluated this evidence differently if it had considered AP's knowledge of DF's prior threats. Soon after the stabbing, AP told the police that he stabbed DF because DF hit his girlfriend, AP feared DF, and AP did not believe he could win a hand-to-hand fight with DF. And AP testified at trial that he was afraid that DF would incapacitate him or knock him unconscious and was also afraid that others from the group might step in to help DF. Without knowing the nature of the prior threats, it is impossible for the trier of fact to adequately consider AP's subjective fear of DF. We hold that the State fails to establish that the exclusion of the prior threats evidence was harmless beyond a reasonable doubt. *Watt*, 160 Wn.2d at 635.

## C. DEGREE OF FORCE

AP argues that he used reasonable force under the circumstances and that without knowing the content of DF's threats, the trial court did not have the evidence needed to determine whether AP used reasonable force. The State argues that, even considering DF's past threats, AP's use of a knife was certainly unjustified when "[DF] did nothing more than shove aside [Herrera]." Br. of Resp't at 4.

The State appears to assume that AP's use of force was unjustified regardless of the nature of DF's threats. However, evaluating AP's use of force requires consideration of his knowledge

and circumstances, which includes his knowledge of DF's prior threats. *Walden*, 131 Wn.2d at 474. The circumstances immediately preceding the stabbing, including DF's pushing Herrera, are isolated facts and, contrary to the State's representations, do not provide a full picture of AP's knowledge and circumstances underlying his use of force.

Without considering DF's threats, one cannot evaluate whether AP used the degree of force that a reasonably prudent person would find necessary under the conditions as they appeared to AP. *Janes*, 121 Wn.2d at 239. AP's knowledge of DF's prior threats is potentially highly probative of whether AP's force was appropriate under his particular circumstances. *See Janes*, 121 Wn.2d at 239. For example, if the prior threats suggested that DF intended to seriously harm AP, a reasonable factfinder could conclude that DF acted reasonably when he stabbed DF aiming for his shoulder. Because the precise nature of DF's threats is unknown, we cannot say, beyond a reasonable doubt, that any reasonable factfinder would have reached the same result if the prior threat evidence had been admitted. *Watt*, 160 Wn.2d at 635.

We reverse and remand for a new trial.

## II. APPELLATE COSTS

AP argues that because he is indigent, we should not impose appellate costs. The State agrees. Accepting the State's concession, we decline to order appellate costs.

No. 49676-3-II

We reverse and remand.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

SUTTON, J.